# GORDON *v.* NEW YORK STOCK EXCHANGE, INC., ET AL.

No. 74–304.   Argued March 25–26, 1975—Decided June 26, 1975

*I. Walton Bader* argued the cause for petitioner. With him on the brief was *Maximilian Bader*.

*William Eldred Jackson* argued the cause for respondents. With him on the brief were *Isaac Shapiro, Mark L. Davidson, John J. Loflin, Jr.,* and *James Brendan May*.

*Howard E. Shapiro* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Bork* and *Assistant Attorney General Kauper*.

*Lawrence E. Nerheim* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging affirmance. With him on the brief were *Walter P. North* and *Frederic T. Spindel*.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the problem of reconciliation of the antitrust laws with a federal regulatory scheme in the particular context of the practice of the securities exchanges and their members of using fixed rates of commission. The United States District Court for the Southern District of New York and the United States Court of Appeals for the Second Circuit concluded that fixed commission rates were immunized from antitrust attack because of the Securities and Exchange Commission's authority to approve or disapprove exchange commission rates and its exercise of that power.

I

In early 1971 petitioner Richard A. Gordon, individually and on behalf of an asserted class of small investors, filed this suit against the New York Stock

Exchange, Inc. (NYSE), the American Stock Exchange, Inc. (Amex), and two member firms of the Exchanges.[1] The complaint challenged a variety of exchange rules and practices and, in particular, claimed that the system of fixed commission rates, utilized by the Exchanges at that time for transactions less than $500,000, violated §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1 and 2. Other challenges in the complaint focused on (1) the volume discount on trades of over 1,000 shares, and the presence of negotiated rather than fixed rates for transactions in excess of $500,000;[2] (2) the rules limiting the number of exchange memberships; and (3) the rules denying discounted commission rates to nonmembers using exchange facilities.[3]

Respondents moved for summary judgment on the ground that the challenged actions were subject to the overriding supervision of the Securities and Exchange Commission (SEC) under § 19 (b) of the Securities Exchange Act of 1934, 48 Stat. 898, as amended, 15 U. S. C. § 78s (b), and, therefore, were not subject to the strictures of the antitrust laws. The District Court granted respondents' motion as to all claims. 366 F. Supp. 1261 (1973). Dismissing the exchange membership limitation and the Robinson-Patman Act conten-

---

[1] The member firms are Merrill Lynch, Pierce, Fenner & Smith, Inc., and Bache & Company, Inc.

[2] Petitioner urged that these practices were in violation of the Robinson-Patman Price Discrimination Act, 49 Stat. 1528, 15 U. S. C. § 13a.

[3] The relief requested included an injunction prohibiting the implementation of certain negotiated commission rates that were to be placed in effect on April 5, 1971, or, alternatively, requiring that negotiated rates be available for transactions of any size. Petitioner also requested treble damages amounting to $1.5 billion and an award of attorneys' fees of $10 million plus interest and costs.

tions as without merit,[4] the court focused on the relationship between the fixed commission rates and the Sherman Act mandates. It utilized the framework for analysis of antitrust immunity in the regulated securities area that was established a decade ago in *Silver v. New York Stock Exchange,* 373 U. S. 341 (1963). Since § 19 (b)(9) of the Exchange Act authorized the SEC to supervise the Exchanges "in respect of such matters as . . . the fixing of reasonable rates of commission," the court held applicable the antitrust immunity reserved in *Silver* for those cases where "review of exchange self-regulation [is] provided through a vehicle other than the antitrust laws." 373 U. S., at 360. It further noted that the practice of fixed commission rates had continued without substantial challenge after the enactment of the 1934 Act, and that the SEC had been engaged in detailed study of the rate structure for a decade, culminating in the requirement for abolition of fixed rates as of May 1, 1975.

On appeal, the Second Circuit affirmed. 498 F. 2d 1303 (1974). Characterizing petitioner's other challenges as frivolous, the appellate court devoted its opinion to the problem of antitrust immunity. It, too, used *Silver* as a basis for its analysis. Because the SEC, by § 19 (b)(9), was given specific review power over the fixing of commission rates, because of the language, legislative history, and policy of the Exchange Act, and because of the SEC's actual exercise of its supervisory

---

[4] In short, the District Court concluded that (1) since petitioner had never applied for exchange membership, he was not in a position to complain that he was arbitrarily precluded from membership; (2) the Exchange Act's § 3 (a)(3), 15 U. S. C. § 78c (a)(3), by its definition of "member," specifically limited access of nonmembers to the Exchanges; and (3) the Robinson-Patman Act did not apply to services or intangibles, but only to commodities or goods, and the latter were not involved in this litigation.

power, the Court of Appeals determined that this case differed from *Silver,* and that antitrust immunity was proper.

By his petition for certiorari, petitioner sought review only of the determination that fixed commission rates are beyond the reach of the antitrust laws. Because of the vital importance of the question, and at the urging of all the parties, we granted certiorari. 419 U. S. 1018 (1974).

## II

Resolution of the issue of antitrust immunity for fixed commission rates may be made adequately only upon a thorough investigation of the practice in the light of statutory restrictions and decided cases. We begin with a brief review of the history of commission rates in the securities industry.

Commission rates for transactions on the stock exchanges have been set by agreement since the establishment of the first exchange in this country. The New York Stock Exchange was formed with the Buttonwood Tree Agreement of 1792, and from the beginning minimum fees were set and observed by the members. That Agreement itself stated:

> " 'We the Subscribers, Brokers for the Purchase and Sale of Public Stock, do hereby solemnly promise and pledge ourselves to each other, that we will not buy or sell from this day for any person whatsoever, any kind of Public Stock at a less rate than one-quarter per cent. Commission on the Specie value, and that we will give a preference to each other in our Negotiations.' " F. Eames, The New York Stock Exchange 14 (1968 ed).

See generally, R. Doede, The Monopoly Power of the New York Stock Exchange, reprinted in Hearings on S. 3169 before the Subcommittee on Securities of the Sen-

ate Committee on Banking, Housing and Urban Affairs, 92d Cong., 2d Sess., 405, 412–427 (1972). Successive constitutions of the NYSE have carried forward this basic provision. Similarly, when Amex emerged in 1908–1910, a pattern of fixed commission rates was adopted there.

These fixed rate policies were not unnoticed by responsible congressional bodies. For example, the House Committee on Banking and Currency, in a general review of the stock exchanges undertaken in 1913, reported that the fixed commission rate rules were "rigidly enforced" in order "to prevent competition amongst the members." H. R. Rep. No. 1593, 62d Cong., 3d Sess., 39 (1913).[5] The report, known as the Pujo Report, did not recommend any change in this policy, for the Committee believed

"the present rates to be reasonable, except as to stocks, say, of $25 or less in value, and that the

---

[5] See, for example, the comments of the report in reviewing evidence on fixed commissions:

"As stated by Mr. Sturgis, a former president of the exchange, since 1876 a governor, and now the chairman of the law committee . . . :

" 'The violation of the commission law we regard as one of the most infamous crimes that a man can commit against his fellow members in the exchange, and as a gross breach of good faith and wrongdoing of the most serious nature, and we consider it a crime that we should punish as severely as, in the judgment of the governing committee, the constitution permits.

.          .          .          .          .

" 'Q. . . . But the breach of that rule (referring to the rule for uniform commissions) by a broker you consider the most heinous crime he can commit?

" 'A. It is absolute bad faith to his fellow men.'

"The rule is rigidly enforced by suspension from one to five years for a first violation and expulsion for a second. . . . The acknowledged object is to prevent competition amongst the members." H. R. Rep. No. 1593, 62d Cong., 3d Sess., 39 (1913).

exchange should be protected in this respect by the law under which it shall be incorporated against a kind of competition between members that would lower the service and threaten the responsibility of members. A very low or competitive commission rate would also promote speculation and destroy the value of membership." *Id.*, at 115–116.

Despite the monopoly power of the few exchanges, exhibited not only in the area of commission rates but in a wide variety of other aspects, the exchanges remained essentially self-regulating and without significant supervision until the adoption of the Securities Exchange Act of 1934, 48 Stat. 881, as amended, 15 U. S. C. § 78a *et seq.* At the lengthy hearings before adoption of that Act, some attention was given to the fixed commission rate practice and to its anticompetitive features. See Hearings on S. Res. 84 (72d Cong.) and S. Res. 56 and 97 (73d Cong.) before the Senate Committee on Banking and Currency, 73d Cong., 1st and 2d Sess., pts. 13, 15, and 16, pp. 6075, 6080, 6868, and 7705 (1934) (hereafter Senate Hearings). See also Hearings on S. Res. 84 before the Senate Committee on Banking and Currency, 72d Cong., 1st Sess., pt. 1, p. 85 (1932); Hearings on H. R. 7852 and H. R. 8720 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 320–321, 423 (1934).

Perhaps the most pertinent testimony in the hearings preparatory to enactment of the Exchange Act was proffered by Samuel Untermyer, formerly chief counsel to the committee that drafted the Pujo Report. In commenting on proposed S. 2693, Mr. Untermyer noted that although the bill would provide the federal supervisory commission with

"the right to prescribe uniform rates of commission, it does not otherwise authorize the Commission to

fix rates, which it seems to me it should do and would do by striking out the word 'uniform.' That would permit the Commission to fix rates.

"The volume of the business transacted on the exchange has increased manyfold. Great fortunes have been made by brokers through this monopoly. The public has no access to the exchange by way of membership except by buying a seat and paying a very large sum for it. Therefore it is a monopoly. Probably it has to be something of a monopoly. But after all it is essentially a public institution. It is the greatest financial agency in the world, and should be not only controlled by the public but it seems to me its membership and the commissions charged should either be fixed by some governmental authority or be supervised by such authority. As matters now stand, the exchange can charge all that the traffic will bear, and that is a burden upon commerce." Senate Hearings 7705.

As finally enacted, the Exchange Act apparently reflected the Untermyer suggestion, for it gave the SEC the power to fix and insure "reasonable" rates. Section 19 (b) provided:

"(b) *The Commission is further authorized, if* after making appropriate request in writing to a national securities exchange that such exchange effect on its own behalf specified changes in its rules and practices, and after appropriate notice and opportunity for hearing, *the Commission determines* that such exchange has not made the changes so requested, and that *such changes are necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in* upon such exchange or to insure fair administration of such exchange, by rules or regulations or by order *to*

*alter or supplement the rules of such exchange* (insofar as necessary or appropriate to effect such changes) *in respect of such matters as . . .* (9) *the fixing of reasonable rates of commission,* interest, listing, and other charges." (Emphasis added.)

This provision conformed to the Act's general policy of self-regulation by the exchanges coupled with oversight by the SEC. It is to be noted that the ninth category is one of 12 specifically enumerated. In *Merrill Lynch, Pierce, Fenner & Smith* v. *Ware,* 414 U. S. 117, 127–128 (1973), we observed:

"Two types of regulation are reflected in the Act. Some provisions impose direct requirements and prohibitions. Among these are mandatory exchange registration, restrictions on broker and dealer borrowing, and the prohibition of manipulative or deceptive practices. Other provisions are flexible and rely on the technique of self-regulation to achieve their objectives. . . . Supervised self-regulation, although consonant with the traditional private governance of exchanges, allows the Government to monitor exchange business in the public interest."

The congressional reports confirm that while the development of rules for the governing of exchanges, as enumerated in § 19 (b), was left to the exchanges themselves in the first instance, the SEC could compel adoption of those changes it felt were necessary to insure fair dealing and protection of the public. See H. R. Rep. No. 1383, 73d Cong., 2d Sess., 15 (1934); S. Rep. No. 792, 73d Cong., 2d Sess., 13 (1934). The latter report, *id.,* at 15, noted that registered exchanges were required to provide the SEC with "complete information" regarding its rules.

## III

With this legislative history in mind, we turn to the actual post-1934 experience of commission rates on the NYSE and Amex. After these two Exchanges had registered in 1934 under § 6 of the Exchange Act, 15 U. S. C. § 78f, both proceeded to prescribe minimum commission rates just as they had prior to the Act. App. A42, A216. These rates were changed periodically by the Exchanges,[6] after their submission to the SEC pursuant to § 6 (a)(4), 15 U. S. C. § 78f (a)(4), and SEC Rule 17a–8, 17 CFR § 240.17a–8. Although several rate changes appear to have been effectuated without comment by the SEC, in other instances the SEC thoroughly exercised its supervisory powers. Thus, for example, as early as 1958 a study of the NYSE commission rates to determine whether the rates were "reasonable and in accordance with the standards contemplated by applicable provisions of the Securities Exchange Act of 1934," was announced by the SEC. SEC Exchange Act Release No. 5678, Apr. 14, 1958, App. A240. This study resulted in an agreement by the NYSE to reduce commission rates in certain transactions, to engage in further study of the rate structure by the NYSE in collaboration with the SEC, and to provide the SEC with greater advance notice of proposed rate changes. SEC Exchange Act Release No. 5889, Feb. 20, 1959, App. A247. The SEC specifically stated that it had undertaken the study "in view of the responsibilities and duties imposed upon the Commission by Section 19 (b) . . . with respect to the rules of na-

---

[6] Since 1947, rates generally have been based on the value of stock in a round lot, SEC Report of Special Study of Securities Markets, H. R. Doc. No. 95, 88th Cong., 1st Sess., pt. 5, p. 103 (1963). There was no volume discount at the time of this SEC report.

tional securities exchanges, including rules relating to the fixing of commission rates." *Ibid.*

Under subsection (d) of § 19 of the Act (which subsection was added in 1961, 75 Stat. 465), the SEC was directed to investigate the adequacy of exchange rules for the protection of investors. Accordingly, the SEC began a detailed study of exchange rules in that year. In 1963 it released its conclusions in a six-volume study. SEC Report of Special Study of Securities Markets, H. R. Doc. No. 95, 88th Cong., 1st Sess. The study, among other things, focused on problems of the structure of commission rates and procedures, and standards for setting and reviewing rate levels. *Id.*, pt. 5, p. 102. The SEC found that the rigid commission rate structure based on value of the round lot was causing a variety of "questionable consequences," such as "give-ups" and the providing of special services for certain large, usually institutional, customers. These attempts indirectly to achieve rate alterations made more difficult the administration of the rate structure and clouded the cost data used as the basis for determination of rates. These effects were believed by the SEC to necessitate a complete study of the structure. Moreover, the SEC concluded that methods for determining the reasonableness of rates were in need of overhaul. Not only was there a need for more complete information about the economics of the securities business and commission rates in particular, but also for a determination and articulation of the criteria important in arriving at a reasonable rate structure. Hence, while the study did not produce any major immediate changes in commission rate structure or levels, it did constitute a careful articulation of the problems in the structure and of the need for further studies that would be essential as a basis for future changes.

Meanwhile, the NYSE began an investigation of its own into the particular aspect of volume discounts from the fixed commission rates. App. A219–A220. This study determined that a volume discount and various other changes were needed, and so recommended to the SEC. The Commission responded in basic agreement. Letter dated Dec. 22, 1965, from SEC Chairman Cohen to NYSE President Funston, App. A249. The NYSE study continued over the next few years and final conclusions were presented to the SEC in early 1968. *Id.*, at A253.[7]

In 1968, the SEC, while continuing the study started earlier in the decade, began to submit a series of specific proposals for change and to require their implementation by the exchanges. Through its Exchange Act Release No. 8324, May 28, 1968, App. A286, the SEC requested the NYSE to revise its commission rate schedule, including a reduction of rates for orders for round lots in excess of 400 shares or, alternatively, the elimination of minimum rate requirements for orders in excess of $50,-000. These changes were viewed by the SEC as interim measures, pending further consideration "in the context of the Commission's responsibilities to consider the national policies embodied both in the securities laws and in the antitrust laws." Letter dated May 28, 1968, from SEC Chairman Cohen to NYSE President Haack, App. A285. In response to these communications, the NYSE (and Amex) eventually adopted a volume discount for orders exceeding 1,000 shares, as well as other alterations in rates, all approved by the SEC. See,

---

[7] The basic NYSE proposal included some volume discounts, continuation of limited give-ups if directed by the customers, termination of "rebative" reciprocal practices, discounts for certain nonmembers, and limitation of membership and discounts to "bona fide broker-dealers." App. A255.

*e. g.,* letter dated Aug. 30, 1968, from Chairman Cohen to President Haack, App. A310; memorandum dated Sept. 20, 1968, Amex Subcommittee on Commission Structure, App. A104.

Members of the securities exchanges faced substantial declines in profits in the late 1960's and early 1970. These were attributed by the NYSE to be due, at least in part, to the fact that general commission rates had not been increased since 1958. Statement of Feb. 13, 1970, by President Haack to the SEC, App. A313. The NYSE determined that a service charge of at least the lesser of $15 or 50% of the required minimum commission on orders of fewer than 1,000 shares should be imposed as an interim measure to restore financial health by bringing rates in line with costs. NYSE Proposed Rule 383, App. A331. See also letter dated Mar. 19, 1970, from President Haack to members of the NYSE, App. A327. This proposal, submitted to the SEC pursuant to its Rule 17a–8, was permitted by the SEC to be placed into operation on a 90-day interim basis. Letter dated Apr. 2, 1970, from SEC Chairman Budge to President Haack, App. A333. Continuation of the interim measure was thereafter permitted pending further rate structure hearings undertaken by the SEC. SEC Exchange Act Release No. 8923, July 2, 1970, App. A336. The interim rates remained in effect until the rate structure change in March 1972.

In 1971 the SEC concluded its hearings begun in 1968. Finding that "minimum commissions on institutional size orders are neither necessary nor appropriate," the SEC announced that it would not object to competitive rates on portions of orders above a stated level. Letter dated Feb. 3, 1971, from SEC Commissioner Smith to President Haack, App. A353. See also SEC Exchange Act Release No. 9007, Oct. 22, 1970, App. A348.

Although at first supporting a $100,000 order as the cutoff below which fixed rates would be allowed, *ibid.,* the SEC later decided to permit use of $500,000 as the breakpoint. After a year's use of this figure, the SEC required the exchanges to reduce the cutoff point to $300,000 in April 1972. Statement of the SEC on the Future Structure of the Securities Markets, Feb. 2, 1972, App. A369, A387, A388 (Policy Study).

The 1972 Policy Study emphasized the problems of the securities markets, and attributed as a major cause of those problems the prevailing commission rate structure. The Policy Study noted:

> "Our concern with the fixed minimum commission . . . is not only with the level of the rate structure but with its side effects as well. Of these, perhaps the most important are the following:
>
> "(a) Dispersion of trading in listed securities.
>
> "(b) Reciprocal practices of various kinds.
>
> "(c) Increasing pressure for exchange membership by institutions." *Id.,* at A385.

Since commission rates had been fixed for a long period of time, however, and since it was possible that revenue would decline if hasty changes were made, the SEC believed that there should be no rush to impose competitive rates. Rather, the effect of switching to competition should be gauged on a step-by-step basis, and changes should be made "at a measured, deliberate pace." *Id.,* at A387. The result of the introduction of competitive rates for orders exceeding $500,000 was found to be a substantial reduction in commissions, with the rate depending on the size of the order. In view of this result, the SEC determined to institute competition in the $300,000–$500,000 range as well.

Further reduction followed relatively quickly. By March 29, 1973, the SEC was considering requiring the re-

duction of the breakpoint on competitive rates to orders in excess of $100,000. SEC Policy Statement on the Structure of a Central Market System 3. In June, the SEC began hearings on the rate schedules, stimulated in part by a request by the NYSE to permit an increase of 15% of the current rate on all orders from $5,000 to $300,-000, and to permit a minimum commission on small orders (below $5,000) as well. SEC Exchange Act Release No. 10206, June 6, 1973, Documentary Appendix to Brief for SEC as *Amicus Curiae* 24 (Doc. App.). Three months later, after completion of the hearings, the SEC determined that it would allow the increases. SEC Exchange Act Release No. 10383, Sept. 11, 1973,[8] Doc. App. 27. The SEC also announced, however, that "[i]t will act promptly to terminate the fixing of commission rates by stock exchanges after April 30, 1975, if the stock exchanges do not adopt rule changes achieving that result." *Id.*, at 28.

Elaboration of the SEC's rationale for this phasing out of fixed commission rates was soon forthcoming. In December 1973, SEC Chairman Garrett noted that the temporary increase in fixed rates (through April 1975) was permitted because of the inflation in the cost of operating the exchanges, the decline in the volume of transactions on the exchanges, and the consequently severe financial losses for the members. SEC Exchange Act Release No. 10560, Dec. 14, 1973, Doc. App. 29. Indeed, without the rate increase, "the continued deterioration in the capital positions of many member firms was foreseeable, with significant capital impairment and indirect, but consequential, harm to investors the likely

---

[8] The increases were permitted through March 31, 1974, without restriction. Such increases could continue from April 1, 1974, through April 30, 1975, if the NYSE permitted its members to charge in excess of the old rate and also permitted reductions in brokerage services in return for discounts from the rate.

result." *Id.,* at 36. The rate increase also would forestall the possibility that the industry would be impaired during transition to competitive rates and other requirements. This view conformed to the suggestion of Senator Williams, Chairman of the Subcommittee on Securities of the Senate Committee on Banking, Housing and Urban Affairs. See statement dated July 27, 1973, of Senator Williams submitted to the SEC, cited in Exchange Act Release No. 10560 n. 12, Doc. App. 37. Although not purporting to elucidate fully its reasons for abolishing fixed rates, the SEC did suggest several considerations basic to its decision: the heterogeneous nature of the brokerage industry; the desirability of insuring trading on, rather than off, the exchanges; doubt that small investors are subsidized by large institutional investors under the fixed rate system; and doubt that small firms would be forced out of business if competitive rates were required.

In response to a request by the NYSE, the SEC permitted amendment to allow competitive rates on nonmember orders below $2,000. SEC Exchange Act Release No. 10670, Mar. 7, 1974, Doc. App. 42. Hearings on intramember commission rates were announced in April 1974. SEC Exchange Act Release No. 10751, Apr. 23, 1974, Doc. App. 45. The SEC concluded that intramember rates should not be fixed beyond April 30, 1975. SEC Exchange Act Release No. 11019, Sept. 19, 1974, Doc. App. 60. At this time the SEC stated:

> "[I]t presently appears to the Commission that it is necessary and appropriate (1) for the protection of investors, (2) to insure fair dealing in securities traded in upon national securities exchanges, and (3) to insure the fair administration of such exchanges, that the rules and practices of such exchanges that require, or have the effect of requir-

ing, exchange members to charge any person fixed minimum rates of commission, should be eliminated." *Id.*, at 63.

The SEC formally requested the exchanges to make the appropriate changes in their rules. When negative responses were received from the NYSE and others, the SEC released for public comment proposed Securities Exchange Act Rules 19b–3 and 10b–22. Proposed Rule 19b–3, applicable to intramember and nonmember rates effective May 1, 1975, would prohibit the exchanges from using or compelling their members to use fixed rates of commission. It also would require the exchanges to provide explicitly in their rules that nothing therein require or permit arrangements or agreements to fix rates. Proposed Rule 10b–22 would prohibit agreements with respect to the fixing of commission rates by brokers, dealers, or members of the exchanges. See SEC Exchange Act Release No. 11073, Oct. 24, 1974, Doc. App. 65.

Upon the conclusion of hearings on the proposed rules, the SEC determined to adopt Rule 19b–3, but not Rule 10b–22. SEC Exchange Act Release No. 11203, Jan. 23, 1975, Doc. App. 109. Effective May 1, 1975, competitive rates were to be utilized by exchange members in transactions of all sizes for persons other than members of the exchanges. Effective May 1, 1976, competitive rates were to be mandatory in transactions for members as well, *i. e.*, floor brokerage rates. Competition in floor brokerage rates was so deferred until 1976 in order to permit an orderly transition.[9] The required

---

[9] It was also believed that members of the exchanges had not expected that floor brokerage rates would be included among those required to be made competitive, and that extra time for planning and adjustment would be needed. The SEC noted, additionally, that the impact of floor brokerage rates on public investors was significantly less than the impact of public rates, *i. e.*, the rates on

transition to competitive rates was based on the SEC's conclusion that competition, rather than fixed rates, would be in the best interests of the securities industry and markets, as well as in the best interests of the investing public and the national economy. *Ibid.* This determination was not based on a simplistic notion in favor of competition, but rather on demonstrated deficiencies of the fixed commission rate structure. Specifically mentioned by the SEC were factors such as the rigidity and delay inherent in the fixed rate system, the potential for distortion, evasion, and conflicts of interest, and fragmentation of markets caused by the fixed rate system. Acknowledging that the fixed rate system perhaps was not all bad in all periods of its use, the SEC explicitly declined to commit itself to permanent abolition of fixed rates in all cases: in the future circumstances might arise that would indicate that reinstitution of fixed rates in certain areas would be appropriate.

The SEC dismissed the arguments against competitive rates that had been raised by various proponents of the status quo. First, the SEC deemed the possibility of destructive competition to be slim, because of the nature of the cost curve in the industry.[10] Second, there was substantial doubt whether maintenance of fixed rates, in fact, provided various subsidies that would be beneficial to the operation of the securities markets. For example, it was unlikely that small investors reaped a subsidy from higher rates charged larger investors, because of

---

transactions for nonmembers. SEC Exchange Act Release No. 11203, Jan. 23, 1975, Doc. App. 109, 110.

[10] In order for destructive competition to occur on a large scale, fixed costs must be a high percentage of total costs, and there must be economies of scale in a wide range of production. Neither of these factors was found to be present in the brokerage industry. *Id.*, at 138–139.

separation of the business between large and small investors. Nor did the SEC believe that regional brokers were substantially benefited by maintenance of fixed rates. Third, the possibility of an exodus from membership on the exchanges was unlikely, and should be dealt with only as it occurred. In any event, inasmuch as the SEC anticipated that there would be detailed studies of the operation of the competitive rates effectuated by its orders, any problems that arose could be effectively resolved upon further consideration.

During this period of concentrated study and action by the SEC, lasting more than a decade, various congressional committees undertook their own consideration of the matter of commission rates. Early in 1972, the Senate Subcommittee on Securities concluded that fixed commission rates must be eliminated on institution-size transactions, and that lower fees should be permitted for small transactions with "unbundled" services than for those having the full range of brokerage services. Senate Committee on Banking, Housing and Urban Affairs, 92d Cong., 2d Sess., Securities Industry Study (For the Period Ended Feb. 4, 1972), 4 (1972) (containing a report of the Subcommittee on Securities). The Subcommittee objected particularly to the failure of the fixed rate system to produce "fair and economic" rates, *id.*, at 59, and to distortion in the rate structure in favor of the institutionally oriented firms.

The Subcommittee was perturbed at the SEC's actions regarding fixed commission rates for several reasons. First, the Subcommittee noted that in litigation the SEC had taken the position that it had not approved NYSE rate changes in 1971, but had merely failed to object to the introduction of the new rates, *id.*, at 58, referring to the SEC position in *Independent Investor Protective League* v. *SEC* (SDNY No. 71–1924), dismissed without

opinion (CA2 1971). This posture precluded review of the SEC action in the Court of Appeals.[11] Second, the Subcommittee was displeased with the length of time the SEC took in arriving at its decisions regarding commission rate structure and level. Third, the Subcommittee feared that statements of the SEC lacked clarity and perpetuated uncertainty as to the status of fixed rates on transactions exceeding $100,000. Therefore, the Subcommittee report stressed:

> "[I]t is essential that fixed commission rates be phased out in an orderly and systematic manner, and that a date certain be set promptly for elimination of fixed commissions on institutional-size transactions, which have resulted in the most serious distortions. Based on the SEC's conclusions and on testimony submitted to the SEC and to this Subcommittee, this could best be achieved by eliminating fixed rates on orders in excess of $100,000." Securities Industry Study, *supra,* at 60.

The House Committee on Interstate and Foreign Commerce, in a report issued only six months after the Senate Report, *supra,* concluded that fixed rates of commission were not in the public interest and should be replaced by competitively determined rates for transactions of all sizes. Such action should occur "without excessive delay." H. R. Rep. No. 92–1519, pp. xiv, 141, 144–145, 146 (1972). Although prodding the SEC to take quick measures to introduce competitive rates for transactions of all sizes, the House Committee deter-

---

[11] This view has been rejected by the United States Court of Appeals for the District of Columbia Circuit. *Independent Broker-Dealers' Trade Assn.* v. *SEC,* 142 U. S. App. D. C. 384, 442 F. 2d 132, cert. denied, 404 U. S. 828 (1971). The SEC appears no longer to take this position. See Brief for SEC as *Amicus Curiae* 38–39, n. 45.

mined to defer enacting legislation so long as reasonable progress was being made. These conclusions resulted from a detailed study, by the Subcommittee, of asserted costs and benefits of competitive versus fixed rates, and reflected information gained through lengthy hearings. *Id.,* at 131–146, and related Study of the Securities Industry, Hearings before the Subcommittee on Commerce and Finance of the House Committee on Interstate and Foreign Commerce, 92d Cong., 1st and 2d Sess., serials 92–37 to 92–37h (1971–1972). Similarly, after lengthy analysis, the Senate Subcommittee on Securities concluded both that competitive rates must be introduced at all transaction levels, and that legislation was not required at that time in view of the progress made by the SEC. Securities Industry Study Report of the Subcommittee on Securities of the Senate Committee on Banking, Housing and Urban Affairs, S. Doc. No. 93–13, pp. 5–7, 43–63 (1973), and Hearings on S. 3169 before the Subcommittee on Securities of the Senate Committee on Banking, Housing and Urban Affairs, 92d Cong., 2d Sess. (1972).

In 1975 both Houses of Congress did in fact enact legislation dealing directly with commission rates. Although the bills initially passed by each chamber differed somewhat, the Conference Committee compromised the differences. Compare H. R. 4111, § 6 (p), as discussed in H. R. Rep. No. 94–123, pp. 51–53, 67–68 (1975), with S. 249, § 6 (e), as discussed in S. Rep. No. 94–75, pp. 71–72, 98 (1975). The measure, as so compromised, was signed by the President on June 4, 1975, 89 Stat. 97.

The new legislation amends § 19 (b) of the Securities Exchange Act to substitute for the heretofore existing provision a scheme for SEC review of proposed rules and rule changes of the various self-regulatory organizations.

Reference to commission rates is now found in the newly amended § 6 (e), generally providing that after the date of enactment "no national securities exchange may impose any schedule or fix rates of commissions, allowances, discounts, or other fees to be charged by its members." 89 Stat. 107. An exception is made for floor brokerage rates which may be fixed by the exchanges until May 1, 1976. Further exceptions from the ban against fixed commissions are provided if approved by the SEC after certain findings: prior to and including November 1, 1976, the Commission may allow the exchanges to fix commissions if it finds this to be "in the public interest," § 6 (e)(1)(A); after November 1, 1976, the exchanges may be permitted by the SEC to fix rates of commission if the SEC finds (1) the rates are reasonable in relation to costs of service (to be determined pursuant to standards of reasonableness published by the SEC), and (2) if the rates "do not impose any burden on competition not necessary or appropriate in furtherance of the purposes of this title, taking into consideration the competitive effects of permitting such schedule or fixed rates weighed against the competitive effects of other lawful actions which the Commission is authorized to take under this title." § 6 (e)(1)(B)(ii). The statute specifically provides that even if the SEC does permit the fixing of rates pursuant to one of these exceptions, the SEC by rule may abrogate such practice if it finds that the fixed rates "are no longer reasonable, in the public interest, or necessary to accomplish the purposes of this title." § 6 (e)(2).

The new section also provides a detailed procedure which the SEC must follow in arriving at its decision to permit fixed commission rates. § 6 (e)(4). This procedure was described in the Conference Report as "comparable to that provided for in Section 18 of the Federal

Trade Commission Act, 15 U. S. C. [§] 58, which is more formal than normal notice and comment rulemaking under Section 553 of title 5 U. S. C. but less formal than 'on the record' procedure under Section[s] 556 and 557 of title 5 U. S. C." H. R. Conf. Rep. No. 94–229, p. 108 (1975). Finally, the amendments require the SEC to file regularly until December 31, 1976, with both branches of Congress, reports concerning the effect of competitive rates on the public interest, investors, and the securities markets. § 6 (e)(3).[12]

As of May 1, 1975, pursuant to order of the SEC,. fixed commission rates were eliminated and competitive rates effectuated. Although it is still too soon to determine the total effect of this alteration, there have been no reports of disastrous effects for the public, investors, the industry, or the markets.

This lengthy history can be summarized briefly: In enacting the Securities Exchange Act of 1934, the Congress gave clear authority to the SEC to supervise exchange self-regulation with respect to the "fixing of reasonable rates of commission." Upon SEC determination that exchange rules or practices regarding commission rates required change in order to protect investors or to insure fair dealing, the SEC was authorized to

---

[12] One further change in the 1975 amendments should be noted. The 1934 Act defined the term "member" of an exchange as any person who, among other things, is permitted "to make use of the facilities of an exchange for transactions thereon . . . with the payment of a commission or fee which is less than that charged the general public." § 3 (a)(3), 48 Stat. 883. This implied a likelihood of fixed rates for the general public, for otherwise it would have been difficult to determine that a member, in fact, was given lower rates. This definition was deleted in the 1975 amendments and has been replaced with a general definition of a member of an exchange. § 3 (a)(3)(A), 89 Stat. 97.

require adoption of such changes as were deemed necessary or appropriate. This legislative permission for the fixing of commission rates under the supervision of the SEC occurred seven years *after* this Court's decision in *United States* v. *Trenton Potteries Co.*, 273 U. S. 392 (1927), to the effect that price fixing was a *per se* violation of the Sherman Act. Since the Exchange Act's adoption, and primarily in the last 15 years, the SEC has been engaged in thorough review of exchange commission rate practices. The committees of the Congress, while recently expressing some dissatisfaction with the progress of the SEC in implementing competitive rates, have generally been content to allow the SEC to proceed without new legislation. As of May 1, 1975, the SEC, by order, has abolished fixed rates. And new legislation, enacted into law June 5, 1975, codifies this result, although still permitting the SEC some discretion to reimpose fixed rates if warranted.

## IV

This Court has considered the issue of implied repeal of the antitrust laws in the context of a variety of regulatory schemes and procedures. Certain axioms of construction are now clearly established. Repeal of the antitrust laws by implication is not favored and not casually to be allowed. Only where there is a "plain repugnancy between the antitrust and regulatory provisions" will repeal be implied. *United States* v. *Philadelphia National Bank*, 374 U. S. 321, 350–351 (1963). See also *Merrill Lynch, Pierce, Fenner & Smith* v. *Ware*, 414 U. S., at 126; *Hughes Tool Co.* v. *Trans World Airlines, Inc.*, 409 U. S. 363, 385–389 (1973); *Carnation Co.* v. *Pacific Conference*, 383 U. S. 213, 217–218 (1966); *Silver* v. *New York Stock Exchange*, 373 U. S.,

at 357–358; *United States* v. *Borden Co.,* 308 U. S. 188, 198–199 (1939). See *United States* v. *National Assn. of Securities Dealers, post,* at 719–720, 729–730.

The starting point for our consideration of the particular issue presented by this case, *viz.,* whether the antitrust laws are impliedly repealed or replaced as a result of the statutory provisions and administrative and congressional experience concerning fixed commission rates, of course, is our decision in *Silver.* There the Court considered the relationship between the antitrust laws and the Securities Exchange Act, and did so specifically with respect to the action of an exchange in ordering its members to remove private direct telephone connections with the offices of nonmembers. Such action, absent any immunity derived from the regulatory laws, would be a *per se* violation of § 1 of the Sherman Act. 373 U. S., at 347. Concluding that the proper approach to the problem was to reconcile the operation of the antitrust laws with a regulatory scheme, the Court established a "guiding principle" for the achievement of this reconciliation. Under this principle, "[r]epeal is to be regarded as implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary." *Id.,* at 357.

In *Silver,* the Court concluded that there was no implied repeal of the antitrust laws in that factual context because the Exchange Act did not provide for SEC jurisdiction or review of particular applications of rules enacted by the exchanges. It noted:

> "Although the Act gives to the Securities and Exchange Commission the power to request exchanges to make changes in their rules, § 19 (b), 15 U. S. C. § 78s (b), and impliedly, therefore, to disapprove any rules adopted by an exchange, see also

§ 6 (a) (4), 15 U. S. C. § 78f (a) (4), it does not give the Commission jurisdiction to review particular instances of enforcement of exchange rules." *Ibid.*

At the time *Silver* was decided, both the rules and constitution of the NYSE provided that the Exchange could require discontinuance of wire service between the office of a member and a nonmember at any time. There was no provision for notice or statement of reasons. While these rules were permissible under the general power of the exchanges to adopt rules regulating relationships between members and nonmembers, and the SEC could disapprove the rules, the SEC could not forbid or regulate any particular application of the rules. Hence, the regulatory agency could not prevent application of the rules that would have undesirable anticompetitive effects; there was no governmental oversight of the exchange's self-regulatory action, and no method of insuring that some attention at least was given to the public interest in competition.

The Court, therefore, concluded that the absence in *Silver* of regulatory supervision over the application of the exchange rules prevented any conflict arising between the regulatory scheme and the antitrust laws. See also *Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439, 455–457 (1945), where the Court found no conflict because the regulatory agency (the Interstate Commerce Commission) had no jurisdiction over the rate-fixing combination involved. The Court in *Silver* cautioned, however, that "[s]hould review of exchange self-regulation be provided through a vehicle other than the antitrust laws, a different case as to antitrust exemption would be presented." 373 U. S., at 360. It amplified this statement in a footnote:

"Were there Commission jurisdiction and ensuing judicial review for scrutiny of a particular exchange

ruling . . . a different case would arise concerning exemption from the operation of laws designed to prevent anticompetitive activity, an issue we do not decide today." *Id.*, at 358 n. 12.

It is patent that the case presently at bar is, indeed, that "different case" to which the Court in *Silver* referred. In contrast to the circumstances of *Silver*, § 19 (b) gave the SEC direct regulatory power over exchange rules and practices with respect to "the fixing of reasonable rates of commission." Not only was the SEC authorized to disapprove rules and practices concerning commission rates, but the agency also was permitted to require alteration or supplementation of the rules and practices when "necessary or appropriate for the protection of investors or to insure fair dealings in securities traded in upon such exchange." Since 1934 all rate changes have been brought to the attention of the SEC, and it has taken an active role in review of proposed rate changes during the last 15 years. Thus, rather than presenting a case of SEC impotence to affect application of exchange rules in particular circumstances, this case involves explicit statutory authorization for SEC review of all exchange rules and practices dealing with rates of commission and resultant SEC continuing activity.

Having determined that this case is, in fact, the "different case," we must then make inquiry as to the proper reconciliation of the regulatory and antitrust statutes involved here, keeping in mind the principle that repeal of the antitrust laws will be "implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary." 373 U. S., at 357. We hold that these requirements for implied repeal are clearly satisfied here. To permit operation of the antitrust laws with respect to commission rates, as urged by

petitioner Gordon and the United States as *amicus curiae,* would unduly interfere, in our view, with the operation of the Securities Exchange Act.

As a threshold matter, we believe that the determination of whether implied repeal of the antitrust laws is necessary to make the Exchange Act provisions work is a matter for the courts, and in particular, for the courts in which the antitrust claims are raised. *Silver* exemplifies this responsibility. In some cases, however, the courts may defer to the regulatory agency involved, in order to take advantage of its special expertise. The decision in the end, however, is for the courts. *Ricci* v. *Chicago Mercantile Exchange,* 409 U. S. 289, 306–308 (1973).

The United States, as *amicus curiae,* suggests not only that the immunity issue is ultimately for the courts to decide, but also that the courts may reach the decision only on a full record. A summary record, as compiled in this case on motions for summary judgment, though voluminous, is said to be an inadequate basis for resolution of the question. We disagree. In *this* case nothing is to be gained from any further factual development that might be possible with a trial on the merits. We have before us the detailed experience of the SEC regulatory activities, and we have the debates in the Congress culminating in the 1975 legislation. This information is sufficient to permit an informed decision as to the existence of an implied repeal.

Our disposition of this case differs from that of the Seventh Circuit in *Thill Securities Corp.* v. *New York Stock Exchange,* 433 F. 2d 264 (1970), cert. denied, 401 U. S. 994 (1971), where antitrust immunity for the NYSE's antirebate rule was claimed and denied. The Court of Appeals reversed a grant of summary judgment in favor of the NYSE, and remanded for further evi-

dence regarding the effects of the antirebate rule on competition, the degree of actual review by the SEC, and the extent to which the rule was necessary to make the Exchange Act work. 433 F. 2d, at 270. This ruling is persuasively distinguishable on at least two grounds from the case at bar: First, there was no evidence presented regarding the extent of SEC review of the challenged rule. Second, the antirebate practice differs from fixed commission rates in that (1) it was not among the items specifically listed in § 19 (b), although the practice might reasonably be thought to be related to the fixing of commission rates, and (2) it does not necessarily apply uniformly, and may be applied in a discriminatory manner. We do not believe it necessary, in the circumstances of this case, to take further evidence concerning the competitive effects of fixed rates, or the necessity of fixed rates as a keystone of the operation of exchanges under the Exchange Act. To the extent that the Court of Appeals in *Thill* viewed the question of implied repeal as a question of fact, concerning whether the particular rule itself is necessary to make the Act work, we decline to follow that lead.

We also regard our specific disposition in *Ricci* v. *Chicago Mercantile Exchange, supra,* as inapposite for this case. In *Ricci,* an antitrust complaint charged that the Chicago Mercantile Exchange arbitrarily transferred a membership, in violation of both the Commodity Exchange Act, 42 Stat. 998, as amended, 7 U. S. C. § 1 *et seq.,* and the exchange rules. We held that consideration of the antitrust claims should be stayed pending determination by the Commodity Exchange Commission as to whether the actions taken were in violation of the Act. or the rules. Although we noted that the Act did not confer a general antitrust immunity, we stated that if the actions complained of were in

conformity with the Act and exchange rules, a substantial question would be presented concerning whether the actions were insulated from antitrust attack. It is manifest, then, that *Ricci* involved a deference to the expertise of a regulatory agency in determining if the activities violated the Act or rules, and did not represent a decision on antitrust immunity where the conduct charged was clearly encompassed by the legislation or rules and where there was no factual dispute.

We believe that the United States, as *amicus*, has confused two questions. On the one hand, there is a factual question as to whether fixed commission rates are actually necessary to the operation of the exchanges as contemplated under the Securities Exchange Act. On the other hand, there is a legal question as to whether allowance of an antitrust suit would conflict with the operation of the regulatory scheme which specifically authorizes the SEC to oversee the fixing of commission rates. The factual question is not before us in this case. Rather, we are concerned with whether antitrust immunity, as a matter of law, must be implied in order to permit the Exchange Act to function as envisioned by the Congress. The issue of the wisdom of fixed rates becomes relevant only when it is determined that there is no antitrust immunity.

The United States appears to suggest that only if there is a pervasive regulatory scheme, as in the public utility area, can it be concluded that the regulatory scheme ousts the antitrust laws. Brief for United States as *Amicus Curiae* 16, 35. It is true that in some prior cases we have been concerned with the question of the pervasiveness of the regulatory scheme as a factor in determining whether there is an implied repeal of the antitrust laws. See, *e. g.*, *Otter Tail Power Co.* v. *United States*, 410 U. S. 366, 373–375 (1973). In the present case, how-

ever, respondents do not claim that repeal should be implied because of a pervasive regulatory scheme, but because of the specific provision of § 19 (b)(9) and the regulatory action thereunder. Brief for Respondents 35. Hence, whether the Exchange Act amounts to pervasive legislation ousting the antitrust acts is not a question before us.

We agree with the District Court and the Court of Appeals, and with respondents, that to deny antitrust immunity with respect to commission rates would be to subject the exchanges and their members to conflicting standards. It is clear from our discussion in Part III, *supra,* that the commission rate practices of the exchanges have been subjected to the scrutiny and approval of the SEC.[13] If antitrust courts were to impose different standards or requirements, the exchanges might find themselves unable to proceed without violation of the mandate of the courts or of the SEC. Such different standards are likely to result because the sole aim of antitrust legislation is to protect competition, whereas the SEC must consider, in addition, the economic health of the investors, the exchanges, and the securities industry.[14] Given the expertise of the SEC, the confidence

---

[13] We believe that this degree of scrutiny and approval by the SEC is not significantly different for our purposes here than an affirmative order to the exchanges to follow fixed rates. The United States, as *amicus curiae,* agrees that if the SEC "were to order the exchanges to adhere to a fixed commission rate system of some kind, no antitrust liability could arise." Brief for United States as *Amicus Curiae* 48. We conclude that immunity should not rest on the existence of a formal order by the SEC, but that the actions taken by the SEC pursuant to § 19 (b)(9), as outlined in Part III, *supra,* are to be viewed as having an effect equivalent to that of a formal order.

[14] Compare *Pan American World Airways* v. *United States,* 371 U. S. 296, 305–310 (1963), with *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 350–352 (1963). In the latter case

the Congress has placed in the agency, and the active roles the SEC and the Congress have taken, permitting courts throughout the country to conduct their own anti-trust proceedings would conflict with the regulatory scheme authorized by Congress rather than supplement that scheme.[15]

In Part III, *supra,* we outlined the legislative and regulatory agency concern with the fixing of commission rates. Beginning with the enactment of the Securities Exchange Act in 1934, the Congress persistently has provided for SEC authority to regulate commission rates. Although SEC action in the early years appears to have been minimal, it is clear that since 1959 the SEC has been engaged in deep and serious study of the commission rate practices of the exchanges and of their members, and has required major changes in those practices. The ultimate result of this long-term study has been a regulatory decree requiring abolition of the practice of fixed rates of commission as of May 1, 1975, and the institution of full and complete competition. Significantly, in the new legislation enacted subsequent to the SEC's abolition of commission rate fixing, the Congress has indicated its continued approval of SEC review of the commission rate structure. Although legislatively

two factors pointed against antitrust immunity: (1) congressional intent in the Bank Merger Act not to immunize activities from antitrust legislation, and (2) the lack of conflict between the Bank Merger Act and Clayton Act standards. Also, there was an absence of continuing oversight by the Comptroller General of the Currency. These factors are not present in, and are inapplicable to, the case at bar.

[15] We note, of course, that judicial review of SEC action is available under the Administrative Procedure Act, 5 U. S. C. §§ 702 and 704, or under § 25 of the Securities Exchange Act, 15 U. S. C. § 78y. See also *Independent Broker-Dealers' Trade Assn.* v. *SEC,* 142 U. S. App. D. C. 384, 442 F. 2d 132, cert. denied, 404 U. S. 828 (1971).

enacting the SEC regulatory provision banning fixed rates, the Congress has explicitly provided that the SEC, under certain circumstances and upon the making of specified findings, may allow reintroduction of fixed rates.

In sum, the statutory provision authorizing regulation, § 19 (b)(9), the long regulatory practice, and the continued congressional approval illustrated by the new legislation, point to one, and only one, conclusion. The Securities Exchange Act was intended by the Congress to leave the supervision of the fixing of reasonable rates of commission to the SEC. Interposition of the antitrust laws, which would bar fixed commission rates as *per se* violations of the Sherman Act, in the face of positive SEC action, would preclude and prevent the operation of the Exchange Act as intended by Congress and as effectuated through SEC regulatory activity. Implied repeal of the antitrust laws is, in fact, necessary to make the Exchange Act work as it was intended; failure to imply repeal would render nugatory the legislative provision for regulatory agency supervision of exchange commission rates.

*Affirmed.*

MR. JUSTICE DOUGLAS, concurring.

The Court relies upon three factors—statutory authorization for regulation by the Securities and Exchange Commission (SEC), a long history of actual SEC oversight and approval, and continued congressional affirmation of the SEC's role—in holding that the system of fixed commission rates employed on the securities exchanges is immune from antitrust attack. While I join that opinion, I write separately to emphasize the single factor which, for me, is of prime importance.

The mere existence of a statutory power of review by the SEC over fixed commission rates cannot justify im-

munizing those rates from antitrust challenges. The antitrust laws are designed to safeguard a strong public interest in free and open competition, and immunity from those laws should properly be implied only when some equivalent mechanism is functioning to protect that public interest. Only if the SEC is actively and aggressively exercising its powers of review and approval can we be sure that fixed commission rates are being monitored in the manner which Congress intended. Cf. *Hughes Tool Co.* v. *Trans World Airlines, Inc.,* 409 U. S. 363, 387–389 (1973).

The Court reviews at length the history of the SEC's involvement with fixed commission rates. In light of that history, I am satisfied to join the opinion of the Court and affirm the judgment below.

Mr. Justice Stewart, with whom Mr. Justice Brennan joins, concurring.

While joining the opinion of the Court, I add a brief word. The Court has never held, and does not hold today, that the antitrust laws are inapplicable to anticompetitive conduct simply because a federal agency has jurisdiction over the activities of one or more of the defendants. An implied repeal of the antitrust laws may be found only if there exists a "plain repugnancy between the antitrust and regulatory provisions." *United States* v. *Philadelphia Nat. Bank,* 374 U. S. 321, 351.

The mere existence of the Commission's reserve power of oversight with respect to rules initially adopted by the exchanges, therefore, does not necessarily immunize those rules from antitrust attack. Rather, "exchange self-regulation is to be regarded as justified in response to antitrust charges only to the extent necessary to protect the achievement of the aims of the Securities Exchange Act." *Silver* v. *New York Stock Exchange,* 373

U. S. 341, 361. The question presented by the present case, therefore, is whether exchange rules fixing minimum commission rates are "necessary to make the Securities Exchange Act work." *Id.,* at 357.

As the Court's opinion explains, see *ante,* at 663–667, when Congress enacted the Securities Exchange Act of 1934, it was fully aware of the well-established exchange practice of fixing commission rates, which had existed continuously since 1792. Nevertheless, Congress chose not to prohibit that practice. Instead, in § 19 (b)(9) of the 1934 Act Congress specifically empowered the Commission to exercise direct supervisory authority over exchange rules respecting "the fixing of reasonable rates of commission." Congress thereby unmistakably determined that, until such time as the Commission ruled to the contrary, exchange rules fixing minimum commission rates would further the policies of the 1934 Act. Accordingly, although the Act contains no express exemption from the antitrust laws for exchange rules establishing fixed commission rates, under *Silver* that particular instance of exchange self-regulation is immune from antitrust attack.