**MOBILFONE OF NORTHEASTERN PENNSYLVANIA, INC.**

v.

**COMMONWEALTH TELEPHONE COMPANY.**

Civ. A. No. 76–1746.

United States District Court, E. D. Pennsylvania.

March 7, 1977.

Boris Shapiro, Philadelphia, Pa., for plaintiff.

Henry Kolowrat, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

TROUTMAN, District Judge.

### HISTORY AND CONTENTIONS

In this an antitrust action, plaintiff, Mobilfone of Northeastern Pennsylvania, Inc. (Mobilfone) seeks to restrain the defendant, Commonwealth Telephone Company (Commonwealth) from establishing a one-way radio signaling service in the greater Wilkes-Barre area, alleging violations of Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. § 1 and § 2 and the Clayton Act, 15 U.S.C. § 26. The service is described by Mobilfone as follows:

> "Telephone users simply dial an ordinary telephone number terminating in Plaintiff's automatic radio signaling system, wait for the established beep tone, then dial Plaintiff's subscriber's assigned number. The number activates the subscriber's receiver to sound an alerting tone."

Mobilfone, currently furnishing such service in the Wilkes-Barre area, also provides mobile phone service to its customers.

Commonwealth, a telephone company serving 100,000 customers and having the sole telephone franchise in the Wilkes-Barre area, seeks the right to also provide one-way radio signaling service in said area.

Alleging violation of the antitrust laws, Mobilfone contends that Commonwealth's sales and advertising facilities are much larger than Mobilfone's; Commonwealth can use one-way signaling as a lure to its telephone service and, therefore, need not earn profit from its signaling business; Commonwealth can use its own wirelines in its one-way signaling service, while Mobilfone must rent its lines from Bell of Pennsylvania; Commonwealth can use service personnel from its wirelines service department to operate on its signaling service, while Mobilfone must employ a special staff of service personnel for its one-way signaling service; Commonwealth refuses to make its wirelines available to Mobilfone.

Commonwealth seeks summary judgment, contending that as a heavily regulated industry, one-way signaling is exempt from antitrust scrutiny.

### PROCEDURAL HISTORY

Commonwealth applied for approval of the right to enter into one-way radio signaling service with the Pennsylvania Public Utility Commission (PUC) and the Federal Communications Commission (FCC). Both agencies granted approval over objection.

The PUC considered the argument here advanced that the grant of approval would "create an undesirable economic situation". It acknowledged that Commonwealth possessed much greater resources than protestant, Mr. Ted Ehrhardt, Mobilfone's principal. It nonetheless concluded that:

> "(T)he furnishing of one-way radio-telephone paging service by an established operating telephone utility is a logical extension of its general telephone service clearly in the public interest, and should be encouraged rather than denied." In Re Application of Commonwealth Telephone Company, Application Docket No. 97564, at p. 3.

The FCC likewise granted approval despite Mobilfone's objections, holding that Mobilfone failed to make out a prima facie case that Commonwealth would charge non-competitive rates, and that this issue was premature because Commonwealth had not yet filed a rate schedule with the PUC.

### DISCUSSION

■ Antitrust immunity is not to be lightly granted.

> "Repeal of the antitrust laws by application is not favored and not casually to be

allowed. Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal be implied." *Gordon v. New York Stock Exchange,* 422 U.S. 659, 682, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975).

"(A)bsent state authority which demonstrates that it is the intent of the state to restrain competition in a given area, *Parker*-type immunity or exemption may not be extended to anti-competitive government activities." *Duke & Company v. Foerster,* 521 F.2d 1277, 1280 (3d Cir. 1975).

"*Parker*-type immunity" is immunity to antitrust laws mandated by the landmark case of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1942), which held that the Sherman Act is a prohibition against individuals, not states.

"In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Id.* at 351, 63 S.Ct. at 313.

The Third Circuit further states that "the Sherman Act is simply inapplicable to activity mandated by state authority". *Duke & Company v. Foerster, supra,* at 1279, n. 5. An intent to restrain competition "may be demonstrated by explicit language in state statutes, *or may be inferred from the nature of the powers and duties given to a particular government entity.*" Id. at 1280 (emphasis added). In *Brenner v. State Board of Motor Vehicle Manufacturers, Dealers and Salesmen,* 413 F.Supp. 639, 646 (E.D.Pa.1976), the Court held that an antitrust action would not lie if the activity complained of "[was] compelled by the direction of the state acting as a sovereign."

Therefore, we shall determine whether there exists such state authority as would mandate a restraint of competition giving rise to an antitrust exemption. We shall examine the extent of state regulation to ascertain if an intent to restrain competition can reasonably be inferred and wheth-er there is a repugnancy between the regulation and antitrust law.

## THE EXTENT OF STATE REGULATION

In *In Re Mervos,* 41 PUC 422 (Docket Numbers 89235 and 89630, 1964) the PUC held that one-way paging is a function of a public utility within the meaning of the Public Utility Law, 66 P.S. 1102(17)(f). It stated that:

"(I)mportant segments of the public will come to regard service of this kind as essential to the conduct of their lives and businesses, and that it cannot in its intrastate and non-technical aspects be left to develop on a haphazard basis." *Id.* at 432.

"(T)he unilateral nature of these signals (one-way paging signals) does not make of them less a 'message or communication', within the meaning of the subsection (f), than telegraph service, which has long and specifically been the subject of state utility regulation." *Id.* at 432.

Thus, the Pennsylvania Utility Law controls entry into this field, 66 P.S. § 1121, and entrants must file an appropriate application with the PUC containing "such information, as the commission shall require by its regulations". 66 P.S. § 1123. Furthermore, "A certificate of public convenience shall be granted by order of the commission, only if and when the commission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public; and the commission, in granting such certificate, may impose such conditions as it may deem to be just and reasonable." *Id.* All who enter the field must submit to the PUC tariffs with proposed rates, which must be "just and reasonable", adhered to and non-discriminatory. 66 P.S. §§ 1141, 1142, 1143, 1144.

Clearly, the state regulates entry into the field. Possible economic adversity, an issue here involved, is one of the many areas into which the PUC inquires, imposing conditions deemed necessary to further the provisions of the Act.

Any utility wishing to change rates must provide sixty (60) days' notice to the PUC of the proposed change. 66 P.S. § 1148. The PUC determines whether the rates are just and reasonable. If they are not, a just and reasonable rate is determined and refunds ordered if rates charged have been excessive. 66 P.S. §§ 1153. The PUC gives notice of proposed rates to interested parties and considers complaints concerning such rates. 66 P.S. § 1148.

Such complete regulatory powers and duties clearly give rise to the *Duke & Company* inference mentioned above, which is reinforced by the intense regulation of rates. The PUC controls all rates, any changes therein, protects consumers from rates that are excessive and needed competitors from rates that are non-competitive.

■ Therefore, the first test prescribed by *Duke & Company* has been met. There is a scheme of regulation so pervasive that an intent to restrain competition can be inferred.

## CONFLICT WITH ANTITRUST LAW

■ Our next concern is with the second test of antitrust exemption. We must determine whether the Pennsylvania scheme of regulation is antagonistic to antitrust law. In *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 596, 96 S.Ct. 3110, 3120, 49 L.Ed.2d 1141, 1153 (1976), the Court stated, "The mere possibility of conflict between state regulatory policy and federal antitrust policy is an insufficient basis for implying an exemption from the antitrust laws." The test is, is the state regulatory policy so antagonistic that an exemption to antitrust law is necessary to make the state regulatory scheme effective?

In granting an antitrust exemption to the Securities Exchange Commission, the Court in *Gordon v. New York Stock Exchange, supra.,* said:

"If antitrust courts were to impose different standards or requirements (than the SEC), the exchanges might find themselves unable to proceed without violation of the mandate of the courts or the SEC. Such different standards are likely to result because the sole aim of antitrust legislation is to protect competition, whereas the SEC must consider, in addition, the economic health of the investors, the exchanges and the securities industry." *Id.* 422 U.S. at 689, 95 S.Ct. at 2614.

So here, utility companies would be plagued by two standards of law without knowing which to follow. Whether to consider only competition or the wider regulatory concerns dictated by public need, and the resulting uncertainty and confusion, must necessarily lead to precisely the situation discussed in *Gordon.* If an exemption is not granted, needless federal-state friction will certainly ensue. PUC difficulties in developing and adhering to its standard of public need if federal courts second-guess it on the narrower competition standard are obvious.

Therefore, we hold that the exemption is necessary to avoid the chaos of conflicting legal standards applied at state and federal levels.

## MOBILFONE'S INAPPOSITE ARGUMENTS

The cases cited by Mobilfone do not support their assertion that antitrust exemption should be denied in this matter. *Industrial Communications System, Inc. et al. v. Pacific Telephone and General Telephone Company of California,* 505 F.2d 152, 156 (9th Cir. 1974), cited by defendant, does hold that the FCC does not regulate the telephone industry to such an extent as to "authorize or suggest a blanket exemption from the antitrust laws with respect to the regulation of rates, practices, or services". However, the Court noted that the California Public Utilities Commission DOES have primary jurisdiction, and distinguished the extent of the regulation by each agency thus:

"Under this dual regulatory system, the FCC exercises regulatory authority over the initial issuance of radio licenses but defers questions regarding rates, 'economic impact' and 'need for service' to the state agency, here the PUC." *Id.* at 156, 157.

The Court then listed the various powers of the California PUC, which included issuance of a certificate of public convenience and necessity as a condition of entry into a regulated field; the power to order a company to furnish or construct facilities or services needed if such services or facilities are inadequate; pervasive and continuing regulation of rates, practices and services; and omnibus authority to exercise its jurisdiction. With regard to these powers, the Court said:

> "Where, as here, a regulatory agency possesses such extensive authority and control over a particular subject matter, and where consideration of the same subject matter is sought before that agency and the courts, the possibility of a judicial-administrative conflict should be avoided." *Id.* at 157.

The Court then stayed proceedings pending the outcome of the PUC's proceedings.

The similarities between the California PUC's powers and the powers of the Pennsylvania PUC are obvious. In the case before us, we need not await the outcome of the PUC decision; the PUC has ruled. Therefore, *Industrial Communications Systems* does not require us to deny exemption in this case.

The case of *Radio Broadcasting Company v. Bell Telephone Company of Pennsylvania,* 325 F.Supp. 168 (E.D.Pa.1971), held that the District Court had jurisdiction despite argument that the FCC had exclusive original jurisdiction. For reasons cited with regard to *Industrial Communication Systems,* that argument is not relevant in our case. We are more concerned with the thorough, complete and pervasive regulation of the PUC than we are with the FCC's regulation of initial issuance of licenses. *United States of America v. American Telephone and Telegraph Co.,* 427 F.Supp. 57 (D.C.D.C.1976); *First Delaware Valley Citizens Television v. CBS,* 398 F.Supp. 917 (E.D.Pa.1975) and *United States v. RCA,* 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959) are inapposite for the same reason. They concern only the FCC regulation and not the more pervasive regulation of rates and services by state regulatory agencies, in this instance, the PUC.

## CONCLUSION

We conclude that there is a pervasive state regulatory scheme with regard to one-way radio signaling and that this scheme cannot work if one-way signaling is not exempt from antitrust laws. Therefore, the exemption must be upheld.

Accordingly, Commonwealth's Motion for Summary Judgment will be granted.