**SHUMATE & COMPANY, INC.,**
**Plaintiff,**

v.

**NEW YORK STOCK EXCHANGE, INC.,**
**et al., Defendants.**

**Civ. A. No. CA–3–4663–D.**

United States District Court,
N. D. Texas,
Dallas Division.

March 31, 1980.

---

B. Thomas McElroy, P. O. Settle, III, Dallas, Tex., for plaintiff.

Fletcher L. Yarbrough, Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., William E. Jackson, Milbank, Tweed, Hadley & McCloy, New York City, for defendants.

William Dietch, Washington, D. C., for Securities and Exchange Commission, amicus curiae.

## MEMORANDUM OPINION AND ORDER

ROBERT M. HILL, District Judge.

Came on for consideration before the court the motion to dismiss or, alternatively, for summary judgment of defendants New York Stock Exchange ("NYSE"), Goldman, Sachs & Company, Kidder, Peabody & Company, Inc., Bateman Eichler, Hill Richards, Inc., Shearson, Hammill & Company, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Bache & Company, Inc., A. G. Becker & Company, Inc., Donaldson, Lufkin & Jenrette, Inc., Murch & Company, Inc., Piper, Jaffray & Hapwood, Inc., Salomon Brothers, and E. F. Hutton & Company, Inc. (collectively called the "remaining defendants"). The court, having reviewed the motion and the briefs filed by the parties and by the Securities and Exchange Commission ("SEC"), as amicus curiae, and having heard the argument of the parties and the SEC on June 23, 1978, is of the opinion that the remaining defendants' motion to dismiss or, alternatively, for summary judgment should be granted.

### Background

Plaintiff Shumate & Company, Inc. ("Shumate") filed this anti-trust action

against the NYSE and certain NYSE officers and members[1] on April 7, 1971. In its original complaint Shumate alleged, on behalf of a class purportedly composed of all over-the-counter dealers and brokers who were not NYSE members, that the defendants had violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2 (1973), by adopting and by adhering to NYSE Rules 394 and 396 ("off-board trading restrictions"). NYSE Rule 394 limited NYSE members' ability to engage in transactions in listed stocks off of the NYSE floor.[2] NYSE Rule 396 imposed similar restrictions on the man-

1. In addition to the remaining defendants, Shumate named as defendants Robert W. Haack, the NYSE's president, Gustave L. Levy, the former chairman of the NYSE's board of governors, Bernard J. Lasker, the chairman of the NYSE's board of governors, Lasker, Stone & Stern, Reynolds & Co., Tucker, Anthony & R. L. Day, Adler, Coleman & Co., Josephthal & Co., Alexander Brown & Sons, J. J. B. Hilliard, W. L. Lyons & Co., Asiel & Co., Wood, Walker & Co., Sprague & Nammack, Weiss, Peck & Greer, Picoli & Co., Lazard Freres & Co., Wagner, Stott & Co., and Benton, Tompane & Co.

2. NYSE Rule 394, which remained in effect from November 7, 1966, until March 31, 1976 provided:

(a) Except as otherwise specifically exempted by the Exchange, members and member organizations must obtain the permission of the Exchange before effecting a transaction in a listed stock off the Exchange, either as principal or agent.

(b) Solicitation of Non-Member Market-Makers to Participate in Transactions Off-the-Floor of the Exchange.

(1) A member or member organization holding a customer's round-lot order for the purchase or sale of stock may, if he so desires, solicit a qualified non-member market-maker to participate in the execution of the order for the non-member's own account, off-the-floor of the Exchange, provided he has reported to a Floor Director, other than the specialist in the stock, that all of the following conditions have been met:

(A) A diligent effort to explore the feasibility of obtaining a satisfactory execution of the order on the floor has been made during that market session.

(B) The member or member organization has provided the Floor Director with the following information:

(i) the name of the stock and size of the order;

(ii) details of the effort made to explore the feasibility of obtaining a satisfactory execution of the order on the Floor;

(iii) the number of shares, if any, he is taking or supplying for his own account; and

(iv) the extent, if any, of the interest the specialist has indicated in participating at an indicated price or prices.

(2) A qualified non-member market-maker in a stock is a broker-dealer registered with the Securities and Exchange Commission as a broker-dealer, who meets the capital and other applicable requirements and who has notified the Exchange that he is available to be solicited for his own account by members and member organizations pursuant to this rule for bids and offers in that stock.

(3) The member or member organization must file a report promptly after the completion of a transaction made pursuant to this rule listing all parties to the transaction; the amount of participation of each; the price; the time of receipt of the order, the time of the off-Floor execution and the name of the Director to whom he reported.

(4) Notwithstanding the provisions of Rule 104, the specialist may buy on a plus or zero plus tick or sell on a minus or zero minus tick, any or all of the stock with respect to which a third market-maker is to be asked to participate.

(5) Under the provision of this rule, a member must ask other members in the crowd immediate prior to the off-Floor trade if they have orders to execute at the same price and on the same side of the market. If such be the case, the non-member market-maker's bid or offer may be displaced in whole or in part by:

(i) any or all bids or offers at that price on the specialist's book and any or all bids or offers made by other brokers acting as agents for other than Registered Traders, registered odd-lot dealers or members or member organizations known by the broker to be acting for their own account; or

(ii) the specialist in the stock, acting as a dealer, if the specialist before the third market-maker was solicited, advised the member or member organization of the extent of his interest at an indicated price or prices at which the transaction is to be made.

(6) No member shall effect a purchase for its customers from a market-maker if, on the basis of information supplied to the member by the market-maker, the market-maker's transaction would involve a short sale on a minus or zero minus tick based on Exchange transactions at the time of the solicitation; provided, however, that this shall not prohibit a transaction which includes a short sale of less than one round lot.

Affidavit of Donald L. Calvin ("Calvin") at Exhibit E.

ner in which NYSE members could buy and sell bonds.[3] Thus, Shumate essentially alleged a concerted refusal to deal or a group boycott and the monopolization or the attempted monopolization of the markets in listed stocks and bonds, and sought both treble damages[4] and an injunction against the continued enforcement of Rules 394 and 396.

On November 19, 1971, the court granted the motions to dismiss for lack of personal jurisdiction of defendants Robert W. Haack, Bernard J. Lasker, Gustave L. Levy, Benton, Tompane & Company, Picoli & Company, Sprague & Nammack, Adler, Coleman & Company, Alexander Brown & Sons, Asiel & Company, J.J.B. Hilliard, W. L. Lyons & Company, Josephthal & Company, Lasker, Stone & Stern, Lazard Freres & Company, Reynolds & Company, Tucker, Anthony & R. L. Day, Wagner, Stott & Company, Weiss, Peck & Greer, and Wood, Walker & Company. On May 11, 1972, the court denied the remaining defendants' motion to dismiss Shumate's complaint for failure to state a claim upon which relief can be granted.[5] Furthermore, the court denied the remaining defendants' motion for reargument of their motion to dismiss on August 23, 1972.[6]

The court then denied Shumate's motion for class certification on April 26, 1973.[7] On July 3, 1974, the court stayed further

---

**3.** NYSE Rule 396, which remained in effect from April 2, 1956, until March 31, 1976, provided:

> Unless the prior consent of the Exchange has been obtained, every order for the purchase or sale of bonds, whether on a principal or agency basis, shall be sent to the Floor for execution except:
> (1) When the order calls for the purchase or sale of ten bonds or more; or
> (2) after a market on the Floor has been diligently sought and it has been ascertained that the order may be executed at a better price elsewhere; or
> (3) in the case of an agency transaction (including intra-office cross transactions), when the customer specifically directs that the particular order shall not be executed on the Floor; but no member or member organization shall solicit such instructions before sending the order to the Floor and diligently seeking a market thereon; or
> (4) when the order calls for the purchase or sale of securities of the United States, Puerto Rico, the Philippine Islands, or States, Territories or Municipalities therein, or of bonds which, pursuant to call or otherwise, are to be redeemed within twelve months.

Calvin at Exhibit A.
NYSE *Const.* art. XIV, § 8 provided for the imposition of sanctions on NYSE members that violated the NYSE's off-board trading restrictions:

> Whenever the Board of Governors [of the NYSE], by the affirmative vote of a majority of the Governors then in office, shall determine that a member . . . deals publicly outside the Exchange in securities dealt in on the Exchange, such member . . . may be suspended or expelled as the Board may determine . . . ..

**4.** Shumate identified five ways in which NYSE Rules 394 and 396 had damaged its business: first, Shumate had had to give up certain commissions to NYSE members; second, Shumate had had to restrict its underwriting of option risks to stocks traded in the third market only; third, it had lost profits because of its inability to trade in listed stocks except in the third market; fourth, Shumate's limited trading ability disabled it from attracting aggressive salesmen in whose commissions it would share; finally, Shumate had been unable to make markets in certain listed stocks. In all, Shumate sought $1,500,000 trebled for its damages during the period prescribed by the pertinent statute of limitations, 15 U.S.C. § 15b (1973), and an indeterminate amount of damages incurred by the other members of the class which it allegedly represented.

**5.** The remaining defendants moved to dismiss on the grounds that Shumate lacked standing to sue because it had failed to qualify to engage in transactions with NYSE members under NYSE Rule 394, see note 2, *supra*, and SEC Rule 19b–1, see note 18, *infra*, and that the SEC's supervision and approval of the off-board trading restrictions immunized them from liability for possible antitrust violations. See *Silver v. NYSE*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), and *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

**6.** The remaining defendants then moved for a stay pending the SEC's exercise of primary jurisdiction. The Court took no action on the remaining defendants' motion for a stay; however, the remaining defendants have abandoned their motion for a stay and their contention that the invocation of the primary jurisdiction doctrine is appropriate. See Reply Memorandum of Defendants in Support of Their Motion to Dismiss or for Summary Judgment (May 19, 1978) at 13.

**7.** Shumate appealed the denial of its motion for class certification; however, the United States Court of Appeals for the Fifth Circuit dismissed

proceedings in this action pending disposition of a related case, *Thill Securities Corporation v. New York Stock Exchange*, No. 63–C–264 (E.D.Wis. filed Oct. 18, 1963).[8] However, the court revoked the stay on October 3, 1977, in order to allow Shumate to file a supplemental complaint and in order to allow the remaining defendants to file a motion to dismiss or a motion for summary judgment.

Shumate's supplemental complaint mirrored its original complaint to a great extent; however, Shumate added a claim that NYSE Rule 390,[9] the successor to NYSE

---

Shumate's appeal. *Shumate & Co. v. Nat'l Ass'n of Securities Dealers*, No. 73–2473 (5th Cir. Aug. 8, 1973).

8. The representative of the plaintiff class in *Thill*, a securities broker-dealer who was registered with the SEC and who was a member of the National Association of Securities Dealers but not of the NYSE, alleged that the NYSE's rule that prohibited NYSE members from sharing commissions with NYSE non-members ("the antirebate rule") violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2 (1973). The district court initially held that Congress had impliedly repealed the antitrust laws as to the antirebate rule because the antirebate rule was an integral part of the fixed commission rate structure which the SEC was empowered to supervise pursuant to 15 U.S.C. § 78s(b)(9) (1971) and granted the NYSE's motion for summary judgment. *Thill*, No. 63–C–264 (E.D.Wis. Aug. 26, 1969) (unpublished opinion). However, the United States Court of Appeals for the Seventh Circuit reversed and remanded the case for trial, holding that the existence of genuine issues of material fact as to whether the SEC was exercising its supervisory authority concerning the fixed commission rate structure and as to whether the antirebate rule was necessary to effectuate the purposes of the Securities Exchange Act of 1934 precluded a finding of implied repeal of the antitrust laws. *Thill*, 433 F.2d 264 (7th Cir. 1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971). After a non-jury trial, the district court reaffirmed its prior holding that the antirebate rule was exempt from the operation of the antitrust laws and entered judgment for the defendant NYSE and the defendant-intervenor SEC. *Thill*, 473 F.Supp. 1364 (E.D.Wis.1979), *appeal docketed,* No. 79–2253 (7th Cir. Oct. 24, 1979).

9. NYSE Rule 390, which has remained in effect with certain minor revisions, since March 31, 1976, *see* Calvin at paragraph 22, provides:
(a) Except as otherwise provided by this Rule, *no member, member organization, or* other person who is a nonmember broker or dealer and who directly or indirectly, controls, is controlled by, or is under common control with, a member or member organization (any such other person being hereinafter referred to as an affiliated person) shall effect any transaction in any listed stock in the over-the-counter market, either as principal or agent.

(b) A member, member organization or affiliated person holding a customer's order for the purchase or sale of a listed stock (the Order) may execute the Order (or such portion thereof as may be so executed in accordance with this Rule) in the over-the-counter market with a third market maker or nonmember block positioner; provided such member, member organization or affiliated person assures that all public bids or offers on the specialist's book at the time of the over-the-counter execution, or, if inquiry is made of the specialist immediately prior to the over-the-counter execution, all public bids or offers on the specialist's book at the time of such inquiry, at prices which, insofar as the Order is concerned, are equal to or better than the price at which such portion of the Order is executed over-the-counter are satisfied at the price at which such portion of the Order is so executed.

(c) Each member, member organization or affiliated person which executes during any calendar week any Order or any portion thereof over-the-counter (other than in a transaction not subject to the provisions of this Rule), shall, prior to the close of business on the last business day of the next succeeding calendar week file a report with the Exchange listing each such over-the-counter execution. As to each such execution, such report shall state the time of the execution, the price or prices thereof, whether such execution was a purchase or a sale by the member, member organization or affiliated person, the number of shares bought or sold at each such price and the name of the third market maker or nonmember block positioner with which the member, member organization or affiliated person dealt.

(d) The provisions of this Rule shall not apply to any of the following transactions:
(i) any transaction which is part of a primary distribution by an issuer, or a registered or unregistered secondary distribution, effected off the floor of the Exchange;
(ii) any transaction made in reliance on Section 4(2) of the Securities Act of 1933;
(iii) any trade at a price unrelated to the current market for the security to correct an error or to enable the seller to make a gift;
(iv) any transaction pursuant to a tender offer;
(v) any purchase or sale of securities effected upon the exercise of an option pursuant to the terms thereof or the exercise of any other right to acquire securities at a pre-estab-

Rule 394, violates §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2 (1973), and included in its claim for damages the losses that it has allegedly incurred since it filed its original complaint.

### The Remaining Defendants' Motion for Summary Judgment

The remaining defendants' motion for summary judgment, filed in accordance with the court's order of October 3, 1977, is based on three grounds: first, the remain-

ing defendants contend that Shumate lacks standing to sue because it failed to qualify as a "non-member market-maker," a "third market-maker," or a "non-member block positioner" that could engage in off-board transactions in listed securities with NYSE members; second, they contend that the Securities Exchange Act of 1934 ("the Act") and the Securities Exchange Act of 1934, as amended ("the amended Act"), immunize them from potential antitrust liability in connection with the enforcement of Rules 394, 390, and 396;[10] and, finally, the re-

lished consideration unrelated to the current market for such securities;

(vi) any purchase or sale of any security trading in which has been suspended by the Exchange pending review of the listing status of such security;

(vii) the acquisition of securities by a member organization as principal in anticipation of making an immediate special offering or exchange distribution on the Exchange under Rule 391 or Rule 392;

(viii) any purchase or sale of any of the guaranteed or preferred stocks included within the listing of such stocks as may from time to time be issued by the Exchange, provided, however, that every proposed transaction in any such security by a member, member organization or affiliated person should be reviewed in light of the factors involved, including the market on the floor of the Exchange, the price, and the size, so that whenever possible the transaction may be effected on the floor;

(ix) any transaction for less than one unit of trading; and

(x) any other purchase or sale of any security under extraordinary or emergency conditions which receives the prior approval of the Exchange.

(e)(1) The term "listed stock" as used in this Rule shall mean any security registered on the Exchange (other than subscription rights), the sale prices of transactions in which are reported on the consolidated tape provided for in the plan filed by the Exchange and others pursuant to Rule 17a–15 under the Securities Exchange Act of 1934 (the Act) and declared effective by the Securities and Exchange Commission;

(2) The term "nonmember broker or dealer" as used in subparagraph (a) of this Rule shall mean any broker or dealer registered in accordance with Section 15(b) of the Act, which acts as a "market maker" as defined in the Act, or whose gross income is derived substantially from acting as a "broker" as defined in the Act, or both;

(3) The term "third market maker" as used in this Rule shall mean a "market maker" as defined in Rule 15c3–1(c)(8) under the Act, who makes markets over-the-counter in list-

ed stocks and who maintains the minimum net capital required of a market maker by Rule 15c3–1 under the Act; and

(4) The term "nonmember block positioner" shall mean a "block positioner" as defined in Rule 17a–17 under the Act which is not a member of the Exchange.

(f)(1) The price at which a transaction is effected, whether on the Exchange or in the over-the-counter market, shall, for purposes of this Rule, mean the price of such transaction, exclusive of any commission, commission equivalent, differential, tax or other charge applicable thereto.

(2) Each limited price order entered on the specialist's book shall, for purposes of this Rule, be considered a public bid or offer unless initiated by a member on the Floor of the Exchange for his own account or for any account in which he, his member organization, or any affiliated person of his member organization has an interest.

(g) Notwithstanding the provisions of Rule 104, the specialist may buy for his own account on a plus or zero plus tick or sell for his own account in a minus or zero minus tick any or all of the stock which is to be sold or purchased over-the-counter pursuant to subparagraph (b) of this Rule.

Calvin at Exhibit J.

10. In their motion for summary judgment the remaining defendants essentially recast and reurge their previous motion to dismiss in light of the Supreme Court's decisions in *U. S. v. National Ass'n of Securities Dealers*, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975), and *Gordon v. NYSE*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), and in light of the amended Act. The court granted the SEC's motion for leave to file a memorandum amicus curiae and for leave to participate in oral argument. The SEC fully supports the remaining defendants' contention that the *Gordon* and *National Ass'n of Securities Dealers* decisions, *supra*, mandate the implied repeal of the antitrust laws with respect to the NYSE's off-board trading restrictions.

maining defendants contend that the off-floor trading restrictions are justified under the "rule of reason" analysis applicable to the securities industry.

▉ The court must reject the "standing" prong of the remaining defendants' motion for summary judgment. However, the remaining defendants' contention concerning the implied repeal of the antitrust laws is meritorious. *Gordon v. New York Stock Exchange*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), is dispositive.

In *Gordon, supra*, a unanimous Supreme Court held that the Act and the amended Act had impliedly repealed the antitrust laws as to the NYSE's system of fixed commission rates. The guiding "principle" in the Court's attempt to reconcile the operation of the Act and the antitrust laws was simply stated: "[r]epeal [of the antitrust laws is to] be . . . 'implied only if necessary to make the . . . Act work, and even then only to the minimum extent necessary.'" *Gordon, supra* at 685, 95 S.Ct. at 2613, *quoting, Silver v. New York Stock Exchange*, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963). The Court in *Gordon* was careful, however, to distinguish the "factual question as to whether fixed commission rates are actually necessary to the operation of the exchanges as contemplated under the . . . Act" from the "legal question as to whether allowance of an antitrust suit would conflict with the operation of the regulatory scheme which specifically authorizes the SEC to oversee the fixing of commission rates." 422 U.S.

at 688, 95 S.Ct. at 2614. In *Gordon*, the Court needed to confront only the "legal question" in order to find an implied repeal of the antitrust laws. *Id.*

The Court first noted that Section 19(b) of the Act, 15 U.S.C. § 78s(b) (1971) ("Section 19(b)"), empowered the SEC to request the NYSE to change "its rules and practices . . . in respect of such matters as . . . (9) the fixing of reasonable rates of commission . . . ." Furthermore, Section 19(b) of the Act authorized the SEC to alter or to supplement the NYSE's rules concerning fixed commission rates if the NYSE refused to make the changes requested by the SEC and if the proposed changes were "necessary or appropriate for the protection of investors or to insure fair dealing in securities traded in upon such exchange . . . ."

The Court next assessed the extent to which the SEC had actually supervised the NYSE's system of fixed commission rates,[11] the degree to which Congress had continued to acquiesce in the SEC's supervisory role,[12] and the impact of the 1975 amendments to the Act ("amendments").[13] "Given the expertise of the SEC, the confidence the Congress has placed in the agency, and the active roles the SEC and the Congress have taken," the Court concluded that "permitting courts throughout the country to conduct their own antitrust proceedings would conflict with [rather than supplement] the regulatory scheme authorized by Congress . . . ." *Gordon, supra* at 689–90, 95 S.Ct. at 2615. The implied repeal of the

---

**11.** The NYSE had submitted all proposed rate changes to the SEC pursuant to § 6(a)(4) of the Act, 15 U.S.C. § 78f(a)(4) (1971), and SEC Rule 17a–8, 17 C.F.R. § 240.17a–8. In 1958 the SEC initiated a study of the NYSE's fixed commission rate system. The 1958 study "resulted in . . . [the NYSE's] agreement . . . to reduce commission rates in certain transactions, to engage in further study of the rate structure . . . in collaboration with the SEC, and to provide the SEC with greater advance notice of proposed rate changes." *Gordon, supra* at 668, 95 S.Ct. at 2605. Pursuant to Section 19(d) of the Act, 15 U.S.C. § 78s(d) (1971), the SEC engaged in a further study of all of the NYSE's rules, including the rules that related to the fixed commission rate structure. This later study, the results of which were

released in 1963, "did not produce any major immediate changes in commission rate structure or levels . . . ."; however, "it did constitute a careful articulation of the problems in the structure and of the need for further studies that would be essential as a basis for future changes." *Id.* at 669, 95 S.Ct. at 2605. The SEC continued to study the fixed commission rate structure in conjunction with the NYSE and adopted a policy that permitted an "orderly transition" from fixed rates to competitive rates. *Id.* at 675, 95 S.Ct. at 2608; *see id.* at 670–77, 95 S.Ct. at 2605–09.

**12.** *Id.* at 677–79, 95 S.Ct. at 2609–10.

**13.** *Id.* at 679–81, 95 S.Ct. at 2610–11.

antitrust laws was necessary "in order to permit the . . . Act to function as envisioned by Congress." *Id.* at 688, 95 S.Ct. at 2614. Exposure to the antitrust laws' operation would "subject the exchanges and their members to conflicting standards," *id.* at 689, 95 S.Ct. at 2614, and "would render nugatory the legislative provision for regulatory agency supervision of exchange commission rates." *Id.* at 691, 95 S.Ct. at 2615.

■ The remaining defendants argue persuasively that the Supreme Court's decisions in *Gordon, supra,* and in *U. S. v. National Association of Securities Dealers,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975), mandate that this Court find, as a matter of law, that the antitrust laws have been repealed as to the NYSE's off-board trading restrictions as well. They argue that the SEC had direct oversight authority over the NYSE's off-board trading restrictions under Section 19(b)(5) of the Act, which permitted the SEC to request that the NYSE amend its rules concerning the "manner, method and place of soliciting business" in listed securities. 15 U.S.C. § 78s(b)(5) (1971). As in *Gordon, supra,* the SEC could alter or supplement the pertinent NYSE rules if the NYSE refused to make the changes that the SEC had requested. In addition, the remaining defendants argue that the off-board trading restrictions come within the SEC's supervisory authority over "the fixing of reasonable rates of commission," 15 U.S.C. § 78s(b)(9) (1971); *cf.* Johnson, *Application of Antitrust Laws to the Securities Industry,* 20 Sw.L.J. 536, 543 (1966) (off-board trading restrictions protect fixed commission rate structure), and over "similar matters," 15 U.S.C. § 78s(b)(13) (1971). Moreover, as in *Gordon, supra,* the remaining defendants argue that the SEC has actively supervised the NYSE's promulgation of off-board trading restrictions. Finally, they argue that the amendments confirm and strengthen the SEC's oversight authority with respect to off-board trading restrictions.

Shumate has articulated no genuine issue of material fact that renders summary judgment for the remaining defendants inappropriate. Rather, Shumate seeks to distinguish the SEC's "active" supervision of the fixed commission rate structure which was at issue in *Gordon, supra,* from the SEC's "passive" supervision of the off-board trading restrictions. Such a distinction is untenable in this context. *Compare California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* —— U.S. ——, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) *and Cantor v. Detroit Edison Company,* 428 U.S. 579, 596–98, 96 S.Ct. 3110, 3120–21, 49 L.Ed.2d 1141 (1976), *with Gordon, supra.*

The SEC asserted its authority to alter or to supplement the NYSE's off-board trading restrictions as early as 1941. *See In the Matter of the Rules of the New York Stock Exchange,* 10 S.E.C. 270 (1941). In 1961, Congress directed the SEC to "make a study and investigation of the adequacy, for the protection of investors, of the rules of national securities exchanges . . ., including rules for the expulsion, suspension, or disciplining of a member for conduct inconsistent with just and equitable principles of trade . . . [and to] report to the Congress on or before April 3, 1963, the results of its study and investigation [of the national securities exchanges' rules] . . ." 15 U.S.C. § 78s(d) (1971).[14] The SEC's 1963 Special Study of Securities Markets examined the off-floor trading restrictions and concluded that further study was necessary prior to any SEC recommendations concerning the propriety of those off-floor trading restrictions.[15] The SEC staff submitted an additional report on off-floor trading restrictions in 1965 and recommended that

---

**14.** The SEC also studied the fixed commission rate structure at this time. *See* note 11, *supra.*

**15.** In 1963 NYSE Rule 394 provided:
Except as otherwise specifically exempted by the Exchange, members and member organizations must obtain the permission of the

Exchange before effecting a transaction in a listed stock off the Exchange either as principal or agent.
Calvin at paragraph 6.
The version of NYSE Rule 396 that was effective in 1963 is set forth in note 3, *supra.*

Rule 394, see note 15, supra, be modified. On September 16, 1966, the SEC proposed the simultaneous modification of NYSE Rule 394 and enactment of SEC Rule 19b–1.[16] NYSE Rule 394, as modified,[17] would enable NYSE members, as agents for their customers, to engage in off-floor transactions with "qualified" non-member market-markers under certain conditions. SEC Rule 19b–1 would establish the standards and the procedure by which non-members could qualify to do business with NYSE members pursuant to NYSE Rule 394.[18]

The NYSE, pursuant to the SEC's request of October 19, 1966, modified NYSE Rule 394. On November 7, 1966, the effective date of NYSE Rule 394, as amended, the SEC enacted SEC Rule 19b–1. C.F.R. 240.19b–1. Both NYSE Rule 394 and SEC Rule 19b–1 remained in effect until March 31, 1976.

The amended Act confirmed and strengthened the SEC's authority to supervise the NYSE's rules concerning off-board trading restrictions. In the amendments Congress specifically directed the SEC to "review any and all rules of national securities exchanges which limit or condition the ability of members to effect transactions in securities otherwise than on such exchanges . . ., [to] report to Congress the results of its review, including the effects on competition of such rules [within ninety days], and . . . [to] commence a proceeding . . . to amend any such rule imposing a burden on competition which does not appear to the . . . [SEC] to be necessary or appropriate in furtherance of the purposes of [the amended Act]." 15 U.S.C. § 78k–1(c)(4)(A) (Supp.1979). Furthermore, the amended Act required the SEC specifically to determine that the national securities exchanges' rules "do not impose any burden on competition not necessary or appropriate in furtherance of the purposes" of the amended Act, 15 U.S.C. § 78f(b)(8) (Supp.1979), and expanded the SEC's power to alter or amend exchange rules, 15 U.S.C. § 78s(c) (Supp.1979).

On September 2, 1975, the SEC reported to Congress that the existing off-board trading restrictions imposed a burden on competition which the SEC was not then prepared to deem necessary or appropriate in furtherance of the purposes of the amended Act. See SEC Release 34–11628

---

**16.** See SEC Release 34–7954 (Sept. 16, 1966); Calvin at Exhibit B.

**17.** See note 2, supra.

**18.** SEC Rule 19b–1, 15 C.F.R. § 240.19b–1, provided:

(a) For the purposes of any rule of a national securities exchange which the Commission shall have requested an exchange to adopt pursuant to the provisions of section 19(b) of the Act and which rule prescribes the conditions under which exchange members may deal with a "qualified nonmember market-maker," any broker-dealer may become and remain qualified as to one or more specified securities registered for trading on a national securities exchange by:

(1) Maintaining (i) a net worth of not less than $1,500,000; or (ii) a minimum net capital of $250,000 (computed as provided in § 240.15c3–1 of this chapter) for each security as to which it is so qualified; and

(2) Making a market in each such security including regularly making bona fide bids and offers for such securities for its own account; and

(3) Filing with the Commission and the exchange an "Initial Statement under § 240.19b–1" showing net worth or net capital required to qualify and the name of each security as to which it is qualified; and

(4) Promptly notifying the Commission and the exchange whenever a change occurs in net worth or net capital which would make it ineligible as a qualified nonmember market-maker under sub-paragraph (1) of this paragraph; and

(5) Filing a report with the Commission and the exchange whenever it thereafter commences or ceases making a market for purposes of this section in any security registered for trading on a national securities exchange, containing the dates of such commencement or cessation forthwith after such action takes place. For the purposes of this subparagraph, a nonmember market-maker may report on Form X–17A–9(1) (§ 240.917(1) of this chapter) and such report will be deemed to also be a filing in compliance with § 240.17a–9(b) unless the broker-dealer specifies that such commencement or cessation is for purposes of § 240.19b–1 only; or he may report on Form X–17A–16(1) (§ 249.631 of this chapter) and such report will be deemed to also be a filing in compliance with §§ 240.17a–9(b) and 240.17a–16(a) or (d) unless the broker-dealer specifies otherwise. Calvin at Exhibit F.

(Sept. 2, 1975); Calvin at Exhibit G. The SEC simultaneously initiated a proceeding under section 19(c) of the amended Act, 15 U.S.C. § 78s(c) (Supp.1979), to determine whether to eliminate or to modify those off-board trading restrictions. *Id.* On December 19, 1975, the SEC announced the adoption of SEC Rule 19c–1, 17 C.F.R. § 240.19c–1, and directed the NYSE to replace Rule 394 with Rule 390. *See* SEC Release 34–11942 (Dec. 19, 1975); Calvin at Exhibit H.[19] Both SEC Rule 19c–1 and NYSE Rule 390 became effective on March 31, 1976, and enabled NYSE members to engage in off-floor agency transactions with third market makers and non-member block positioners.

The SEC has continued to examine and to revise the NYSE's off-board trading restrictions in conjunction with its efforts to formulate a national market system. *See* SEC Release 34–13662 (June 23, 1977); Calvin at Exhibit M. On December 30, 1977, the SEC proposed to amend SEC Rule 19c–1. *See* SEC Release 34–14325 (Dec. 30, 1977); Calvin at Exhibit O. Amended SEC Rule 19c–

1, which became effective March 1, 1978, permits all types of off-floor agency transactions except "in-house crosses," i. e., transactions in which a member acts as agent for both parties. Off-board trading restrictions on principal transactions remain; however, they, too, have been subject to continuous SEC oversight. *Id.; see also* SEC Release 34–14416 (Jan. 26, 1978); Calvin at Exhibit P. Even this cursory review of the history of NYSE Rule 390 and its predecessor, NYSE Rule 394, establishes the remaining defendants' immunity from the antitrust laws' operation as a matter of law. The subjection of NYSE Rules 394 and 390 to the SEC's continuous oversight necessarily ends this court's inquiry.

The SEC has not mandated or authorized the revision of NYSE Rule 396 as often as it has the revision of NYSE Rule 394. NYSE Rule 396 has been amended only twice in the twenty-four years that it has been in effect; however, NYSE Rule 396 is within the ambit of the SEC's supervision. Accordingly, the remaining defendants are immune from antitrust liability for their enforcement and their adherence to NYSE Rule 396 as well.[20]

**19.** SEC Rule 19c–1, 17 C.F.R. § 240.19c–1, which remained in effect from March 31, 1976, until March 1, 1978, provided: The rules of each national securities exchange shall provide, after March 30, 1976, as follows:

(a) Except as hereinafter provided by this rule, no rule, stated policy or practice of this exchange shall prohibit or condition, or be construed to prohibit, condition or otherwise limit, directly or indirectly, the ability of any member acting as agent to effect transactions on any other exchange or over-the-counter with a third market maker or nonmember block positioner in any equity security which is listed on the exchange or to which unlisted trading privileges on the exchange have been extended ("exchange securities").

(b) Beginning March 31, 1976, and ending January 2, 1977, the provisions of paragraph (a) of this section shall not apply to a rule of this exchange approved by the Securities and Exchange Commission pursuant to section 19(b)(2) of the Act which assures that, either immediately before, simultaneously with or immediately after execution of a transaction in any exchange security over-the-counter with a third market maker or nonmember block positioner, public bids or offers entered on the specialist's book, or on any other limit order mechanism on such exchange, as limited price orders at prices equal to or better than the transaction price ("limit orders")

are satisfied at the limit prices bid or offered: Provided, however, That such limit orders may be required to be satisfied at the transaction price under circumstances consistent with the purposes of this rule, the public interest and the protection of investors.

(c) For purposes of this rule:

(1) The term "third market maker" shall mean a "market maker" as defined in Rule 15c3–1(c)(8) (§ 240.15c3–1(c)(8)) under the Act, who makes markets over-the-counter in exchange securities and who maintains the minimum net capital required of a market maker by Rule 15c3–1 (§ 240.15c3–1) under the Act.

(2) The term "nonmember block positioner" shall mean a "block positioner" as defined in Rule 17a–17 (§ 240.17a–17) under the Act which is not a member of this exchange. Calvin at Exhibit I.

NYSE Rule 390 is set forth in note 9, *supra*.

**20.** The court finds as a matter of law that the remaining defendants' challenged conduct is immune from the antitrust laws' operation under the Supreme Court's analysis in *Gordon, supra*. In addition, the court concurs with the SEC's argument that the remaining defendants' conduct after the effective date of the amendments is immune from the antitrust laws' operation under the Supreme Court's analysis in *U. S. v. National Ass'n of Securities Dealers, su-*

## Conclusion

The remaining defendants have met their burden of demonstrating both the absence of any genuine issue of material fact and their entitlement to judgment as a matter of law. The remaining defendants' continued adherence to certain off-board trading restrictions stems not from the SEC's "impotence" to affect changes in those restrictions, *Gordon, supra,* 422 U.S. at 685, 95 S.Ct. at 2613, but from the SEC's policy of gradualism. Although the NYSE's off-board trading restrictions may not be essential to the health of the stock exchanges and to the protection of investors, *see generally* Johnson, *supra,* the implied repeal of the antitrust laws with respect to these off-board trading restrictions is necessary to effectuate the purposes of the Act and the amended Act.[21]

Therefore, the remaining defendants' motion to dismiss or, alternatively, for summary judgment should be granted and a final judgment dismissing Shumate's claims against the remaining defendants with prejudice should be entered accordingly.

It is so ORDERED.

---

*pra. Cf. Harding v. American Stock Exchange,* 527 F.2d 1366, 1369 n. 4 (5th Cir. 1976) (amended Act may be "pervasive regulatory scheme" for purposes of finding the implied repeal of the antitrust laws).

21. The court's finding that the Act and the amended Act have impliedly repealed the anti-

trust laws with respect to the NYSE's off-board trading restrictions renders unnecessary any discussion of the "reasonableness" of those restrictions. *Cf. Gordon, supra* at 688, 95 S.Ct. at 2614 ("the wisdom of fixed rates becomes relevant only when it is determined that there is no antitrust immunity").