**CABLEAMERICA CORPORATION and Cable Alabama Corporation, Plaintiffs,**

v.

**FEDERAL TRADE COMMISSION, et al., Defendants.**

No. CV–91–N–2932–NE.

United States District Court, N.D. Alabama, Northeastern Division.

April 13, 1992.

David Overlock Stewart, Thomas B. Smith, Ropes & Gray, Washington, D.C., Roderic G. Steakley, Joe H. Ritch, Sirote and Permutt P.C., Huntsville, Ala., for plaintiffs.

George C. Batcheler, U.S. Attorney's Office, Birmingham, Ala., James M. Spears, General Counsel, Benjamin I. Berman, David C. Shonka, Federal Trade Com'n, Office of General Counsel, Washington, D.C., for defendants.

## MEMORANDUM OF OPINION

EDWIN L. NELSON, District Judge.

### I. Background.

In this civil action, the plaintiffs ask the court to enjoin the Federal Trade Commission ["FTC"] from conducting a premerger antitrust investigation under provisions of the Hart–Scott–Rodino Antitrust Improvements Act, 15 U.S.C. § 18a ["HSR Act"].

Following the decision of this court in *Cable Alabama Corporation v. City of Huntsville, Ala., et al.,* 768 F.Supp. 1484 (N.D.Ala.1991), Comcast Corporation ["Comcast"], a cable system operator serving Huntsville, Alabama, agreed to purchase the competing Huntsville cable operation owned by Cable Alabama Corporation [Cable Alabama].[1] At the FTC's prompting, both Comcast and Cable Alabama filed premerger reports as provided by the HSR Act. When the FTC requested additional information, Comcast balked and the two cable operators were unable to complete their merger. Cable Alabama then filed this action, claiming the FTC has no jurisdiction to enforce the antitrust laws where two competing cable television operators seek to merge their systems because jurisdiction of such mergers is allocated to the Federal Communications Commission under provisions of the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779, 47 U.S.C. § 521 *et seq.* (The Cable Act.) Cable Alabama also claims the FTC's action infringes its First Amendment right to refrain from speaking about the Huntsville cable television market.

The cause is presently before the court on the plaintiffs' application for a preliminary injunction and the defendants' motion to dismiss for want of jurisdiction and for failure to state a claim. The FTC claims, *inter alia,* that Cable Alabama has not alleged unlawful conduct on the part of the FTC because there is no implied antitrust immunity for cable overbuild mergers and

---

1. The plaintiffs here are CableAmerica Corporation and Cable Alabama Corporation. In the interest of brevity, both will they will be referred to as Cable Alabama.

the FTC's request for information under the HSR Act does not abridge Cable Alabama's rights under the First Amendment. The FTC also claims this court lacks jurisdiction to hear Cable Alabama's claims.

The motions were argued to the court on Wednesday, April 1, 1992. The parties did not avail themselves of the opportunity to offer evidence.

## II. Jurisdiction.

Section 10(c) of the Administrative Procedure Act, 5 U.S.C. § 704 provides:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.

*Id.* There is no provision making the FTC's request for additional information under the HSR Act "reviewable by statute." The FTC claims this court lacks jurisdiction because there has been no final agency action and the issues are not ripe for review.

In *Abbott Laboratories v. Gardner,* the Supreme Court held that a controversy is ripe for judicial review when: (1) the issues are fit for judicial decision and (2) withholding of court consideration will create hardship for the parties. 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

In one sense, a delay in the court's consideration of the question will create hardship for Cable Alabama, since the FTC's request for additional information has had the effect of preventing a merger that Cable Alabama urgently desires.[2] The FTC claims that *Flowers Industries v. F.T.C.,* 849 F.2d 551 (11th Cir.1988) controls the outcome of this matter. In *Flowers,* the Eleventh Circuit found the lawsuit was premature because the parties had not completed the administrative process. Applying the *Abbott Laboratories* test, the *Flowers* court said that the plaintiff would suffer no hardship if the court withheld consideration of the matter at issue since the FTC could enforce civil penalties only through an agency enforcement action in the district court. Similarly, under the HSR Act the FTC must either sue to enjoin a threatened merger or sue to seek penalties for a completed merger, if the parties do not comply with the Act's reporting requirements. 15 U.S.C. § 18a(g). However, the plaintiff in *Flowers* was in a materially different position than is the plaintiff here. As the *Flowers* court noted, the dispositive question was whether withholding of judicial review would cause hardship to the parties. In *Flowers,* the FTC approved the sale of one of plaintiff's bakeries to a buyer that was not acceptable to plaintiff, but the bakery could not be sold until the FTC brought an enforcement action. *Flowers,* 849 F.2d at 553. Here, the plaintiff wants to sell its company, and the FTC action seemingly has the effect of scaring off its buyer. The plaintiff's situation here is more akin to the situation of the plaintiffs in *Abbott Laboratories,* since in both cases the agency action forced the plaintiff to comply with certain requirements before proceeding with a desired course of action. Cable Alabama must choose between disadvantageous compliance and the risk of serious penalties for noncompliance. *Abbott Laboratories,* 387 U.S. at 153, 87 S.Ct. at 1517.

However, the effect on the plaintiff of the FTC's request for additional information may not be sufficiently direct and immediate to justify judicial review at this stage. *Abbott Laboratories,* 387 U.S. at 152–53, 87 S.Ct. at 1517. As noted below the FTC's request for additional information does not prevent the parties from merging, it merely delays the merger until the requested information is provided. It is Comcast that has prevented the merger, not the FTC. Therefore, there is some question that the hardship plaintiff identifies here is a "direct and immediate" result of the agency action.

Furthermore, there is some question about whether the issues presented are fit

---

2. However, as noted below, the failure of the merger is not a direct result of the agency action, but of Comcast's refusal to comply with the FTC request.

for judicial review. In *Abbott Laboratories*, the Supreme Court found an agency action was fit for judicial review when the tendered issue was purely legal and the agency action was final. *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515. The question of whether § 533(c) of the Cable Act creates an implied antitrust immunity for cable system mergers in overbuild areas is a purely legal issue which can be resolved without factual development in proceedings before the FTC.[3]

However, this court cannot review unless the FTC's request for additional information under the HSR Act was a "final" agency action. 5 U.S.C. § 704. *Abbott* made it clear that an agency's regulations are "final agency action." However, in *FTC v. Standard Oil Co.*, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) (hereinafter, "*Socal*"), the court held that one who is charged with a violation may not challenge the FTC's issuance of a complaint.

■ "Agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act. *Socal*, 449 U.S. at 238 n. 7, 101 S.Ct. at 492 n. 7 (citing 5 U.S.C. § 701(b)(2), § 551(13)). An "order" is the whole or a part of a final disposition of an agency in a matter other than rulemaking. *Id.*, citing 5 U.S.C. § 551(6).

> The term 'agency action' brings together previously defined terms in order to simplify the language of the judicial-review provisions of section 10 and to assure the complete coverage of every form of agency power, proceeding, action, or inaction. In that respect the term includes the supporting procedures, findings, conclusions, or statements or reasons or basis for the action or inaction.

*Id.*, citing S Doc No. 248, 79th Cong., 2d Sess, 255 (1946). The FTC's request, pursuant to its authority under the HSR Act, for additional information satisfies the test for "agency action."

■ The cases dealing with judicial review of administrative actions have interpreted the finality element in a pragmatic way. *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515. In *Abbott*, the court found it significant that the agency had made a "definitive" statement of its position, *Id.* at 152, 87 S.Ct. at 1517, that the regulation had a direct and immediate effect on the day to day business of the complaining parties, *Id.* at 152, 87 S.Ct. at 1517, and that the regulation had the status of law. *Id.* Also significant, the challenge raised a legal issue fit for judicial resolution and preenforcement judicial review was likely to speed enforcement. *Id.* at 153, 154, 87 S.Ct. at 1517, 1518. Here, the FTC merely requested additional information and did not make a "definitive statement" of its position. Neither does the request for additional information, in itself, have any legal or practical effect on the merger except to impose upon the parties the burden of complying with the request for information prior to merging and to delay the merger for the time required to comply with the request. An agency action is not final merely because it has the effect of requiring a party to participate in an agency proceeding. *Aluminum Co. of America v. United States*, 790 F.2d 938, 941 (D.C.Cir.1986) (citations omitted). Comcast's refusal to merge is not a "legal or practical" effect of the agency's order; it is an effect of Comcast's reaction to the agency's order. Finally, judicial review will not, as it did in *Abbott Laboratories*, speed enforcement of the antitrust action. In fact, judicial review at this juncture will only hinder the FTC's investigation of the merger.

■ Nevertheless, at least in some circumstances, a district court may enjoin a federal agency from acting in excess of its statutory or constitutional authority. *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). The *Leedom* court noted that the order at issue was not "a final order," 358 U.S. at 187, 79 S.Ct. at 183, but

---

**3.** The FTC claims that the other question presented, whether Cable Alabama's First Amendment right not to speak is being infringed by the FTC investigation, depends on wheth-

er Comcast is the only entity that can acquire Cable Alabama. That factual issue, the FTC claims, is for the agency to determine.

found jurisdiction because the suit was "not one to 'review,'" an agency decision, but it was an action to strike down an agency order made in excess of its delegated powers and contrary to a specific prohibition in its organic statute. *Id.*, 358 U.S. at 188, 79 S.Ct. at 183. The court found that, at least in circumstances in which the agency clearly lacked jurisdiction to act, the administrative remedies need not be exhausted before going to a district court for an injunction. "Nonfinal agency actions are interlocutorily reviewable in extraordinary circumstances—where, for example, they are in clear violation of the law." *Aluminum Co. of America*, 790 F.2d at 942 (Scalia, J.). Here, however the FTC's alleged lack of jurisdiction is not clear, and the FTC's request for additional information is not in clear violation of the law.

In sum, the court finds that it lacks jurisdiction to hear Cable Alabama's claims.

### III. The FTC's Jurisdiction.

Alternatively, the court has concluded that Cable Alabama's claims are due to be dismissed on their merits.

With exceptions not pertinent here, the FTC has the authority to enforce Section 7 of the Clayton Act and Section 5 of the FTC Act against "all ... character of commerce." 15 U.S.C. § 21(a). Plaintiffs claim, however, that Section 533(c) of the Cable Act confers the power to regulate cable overbuild[4] mergers to the Federal Communications Commission [FCC], impliedly preempting the FTC from reviewing the merger under the antitrust laws. 47 U.S.C. § 533(c). The FTC argues that Section 533(c) confers upon the FCC no power to regulate cable overbuild mergers, but if such power is conferred, that power is not repugnant to enforcement of the antitrust laws by the FTC, creating no implied antitrust preemption.

---

**4.** The word "overbuild" is used in the cable television industry to describe situations in which two or more cable systems cover and

### A. *The FCC's Regulatory Authority under the Cable Act.*

Faced with a question of statutory interpretation, the starting point must be the language of the statute. *Gulf Life Insurance Co. v. Arnold*, 809 F.2d 1520, 1522 (11th Cir.1987). The court must assume Congress intended the ordinary meaning of the words it used and absent a clearly expressed legislative intent to the contrary, that language is generally dispositive. *Id.* (citations omitted). The pertinent portions of Section 533 of the Cable Act provide:

### § 533. Ownership restrictions

.  .  .  .  .

(c) The [FCC] may prescribe rules with respect to the ownership or control of cable systems by persons who own or control other media of mass communications which serve the same community served by the cable system.

.  .  .  .  .

(g) For purposes of this section, the term "media of mass communications" shall have the meaning given such term under ... [47 U.S.C. § 309(i)(3)(C)(i).

47 U.S.C. § 533. The term "media of mass communication" includes television, radio, cable television, multipoint distribution service, direct broadcast satellite service, and other services, the licensed facilities of which may be substantially devoted toward providing programming or other information services within the editorial control of the licensee. 47 U.S.C. § 309(i)(3)(C)(i). The FTC claims the phrase "other media of mass communications" in Section 533(c) means media of mass communications *other than another cable system*. However, the term "media of mass communication" includes "cable television." The word "other" in Section 533(c) is most naturally read as referring to media of mass communication "other" than the cable system being acquired. Sections 533(c), 533(g), and 309(i)(3)(C)(i), read *in pari materia*, plainly grant the FCC authority to regulate owner-

operate competitively in the same geographic area.

ship or control of cable systems by persons who own other cable systems which serve the same community.

■ The FTC also claims the FCC has concluded that it has no authority to regulate cable overbuilds under Section 533(c). When an agency has a special duty to administer a statute, its interpretation of the statute is entitled to deference if the interpretation is consistent with congressional purpose. *Morton v. Ruiz*, 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974).

Prior to passage of the Cable Act, the FCC considered whether to exercise regulatory control over ownership of cable systems several times. *In re* Amendment of Part 74, Subpart K, of the Commission's Rules and Regulations Relative to Community Antenna Television Systems, etc., 15 F.C.C.2d 417, 426 (1968) (Def.App. J); 23 F.C.C.2d 833, 835–36 (1970) (Def.App. K); K. Gordon, J. Levy, and R. Preece, *FCC Policy on Cable Ownership*, (Staff Report, FCC Office of Plans and Policy) (November 1981) (Def.App. L at 86, 97 n. 27); *In re* Amendment of Part 76, Subpart J of the Commission's Rules and Regulations Relative to Diversification of Control of Community Antenna Television Systems; and Inquiry with Respect thereto to Formulate Regulatory Policy and Rulemaking and/or Legislative Proposals, 91 F.C.C.2d 46, 49 (1982) (Def.App. M). The FCC had previously conducted studies which led it to conclude that separate cable systems do not compete directly, and it therefore focused its concerns on the advisability of limiting multiple system ownership. *See, e.g., In re* Amendment of Part 76, Def.App. M at 49. The FCC study included an observation that, if cable ownership patterns changed "drastically" in the future, antitrust laws could be used to remedy problems caused by multiple system ownership (MSO) concentration and the FCC could reconsider the question of MSO limitations at a later date. Def.App. M at p. 49–50.

In a 1984 rulemaking procedure, the FCC noted that the passage of the Cable Act required some changes in the Commission's rules. The sections of the Cable Act the FCC believed affected its regulatory responsibilities were set out in the notice of proposed rulemaking. As to Section 613(c) of the Cable Act (47 U.S.C. § 533(c)), the FCC noted it had authority thereunder to enact rules relating to local crossownership between cable systems and other media of mass communication, specifically noting that "media of mass communication" was defined in the Communications Act of 1934. The FCC stated:

> Given the explicit authority of Section 613(c) related to local crossownership and the definition of Section 613(g), we believe it is appropriate at this time for the Commission to consider whether its cable crossownership restrictions should apply to other competing media of mass communications. Thus, we seek comment from the public regarding whether competing media, such as MDS, should be prohibited from owning a cable television system in their local service area.

49 Fed.Reg. 48769 (December 14, 1984) (Def.App. Q). After the procedure, the FCC decided not to regulate, but noted it had "authority to establish additional rules" if it deemed additional ownership restrictions were necessary. 50 Fed.Reg. 18646 (May 2, 1985) (Def.App. R). The FCC's interest in rules controlling crossownership of cable systems and media other than cable systems does not establish that the FCC had concluded it could not regulate ownership of cable systems by persons owning other cable systems.

In a 1989 FCC policy proceeding, the FCC noted the franchise process under the Cable Act may have been inadvertently structured in such a way as to impede local cable-versus-cable competition. (Def.App. X, p. 366). The FCC noted that the Act allows, but does not require, the franchising authority to grant more than one franchise to serve the same community. *Id.* It asked:

> d. To what extent have franchising authorities in communities with competing cable systems allowed or even encouraged such systems to merge or divide their territory? What are the rationales for allowing or encouraging such behavior?

e. Should the Cable Act be modified to establish structural rules, or to encourage antitrust action, to prevent mergers among cable systems competing in the same local market? ...

*Id.* The FTC claims that question "e" reflects the FCC's belief that it cannot regulate overbuilds under the current Cable Act. Cable Alabama says this question indicates the FCC believes "antitrust action" against overbuild mergers is barred under the Cable Act as it is currently written. Read in context, it is clear the FCC was contemplating revision of the portions of the Cable Act which gives local franchising authorities certain discretionary powers which have had the effect of inhibiting competition. Although the FCC asked for comments regarding a revision of the Cable Act which would "encourage" antitrust action, there is no way of concluding therefrom that the FCC believed the current version *prohibited* antitrust action. The legislative history indicates otherwise. [Defendant's Appendix E, p. 59]. However, neither does the question prove the FCC believed it could not undertake regulation of cable ownership.

In a 1990 report, the FCC noted that the relatively small number of directly competitive second cable systems could be attributed to less attractive economics, restrictive requirements by franchising authorities, and predatory activity by incumbents and other advantages of incumbency. [Def.App. Z, p. 52]. The FCC found that a change in the franchising process would encourage competition among cable systems, and concluded that, while it may not be feasible to require the award of franchises to two competing systems, local franchisers should not discourage competition. The FCC recommended that Congress amend the Cable Act to forbid local franchise authorities from unreasonably denying franchises to applicants that could provide service, and to make clear that local franchisers may not pass rules whose intent or effect is to create unreasonable barriers to the entry of competing cable systems. (Def.App. Z, pp. 52–53, 72–76).

Nowhere in all of these documents submitted by the FTC has the FCC clearly set out its view of the scope of its regulatory power under Section 533(c) of the Cable Act. The FCC has not indicated that it interprets 533(c) as only allowing FCC regulation of ownership between cable systems and local media other than cable and neither has it indicated whether it believes it has the power to regulate purchases of cable systems by owners of other cable systems in the area. However, as noted above, the plain language of the statute provides for FCC regulation of ownership or control of cable systems by persons who own or control other cable systems which serve the same community. 47 U.S.C. § 533(c). Since there is no ambiguity in the statute, the lack of comment by the FCC does not alter the court's conclusion that Section 533(c) confers on the FCC authority to regulate cable overbuild mergers.

B. *Implied Antitrust Immunity.*

Repeal of the antitrust laws by implication is not favored and not casually to be allowed. *Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659, 682, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975). "Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal be implied." *Id.,* (citing *United States v. Philadelphia National Bank,* 374 U.S. 321, 350–351, 83 S.Ct. 1715, 1734–35, 10 L.Ed.2d 915 (1963)). Repeal is implied only if necessary to make the regulatory statute work, and even then only to the minimum extent necessary. *Id.,* 422 U.S. at 683, 95 S.Ct. at 2611. The pervasiveness of the regulatory scheme is a factor in determining whether there is an implied repeal of the antitrust laws. *Id.* at 688, 95 S.Ct. at 2614. Repeal may also be implied because of a specific provision and the regulatory action thereunder. *Gordon,* 422 U.S. at 689, 95 S.Ct. at 2614. A regulatory agency's approval of a merger or acquisition is no bar to an antitrust suit, even where the impact on competition is relevant to the agency's determination. *Otter Tail Power Co. v. United States,* 410 U.S. 366, 373, 93 S.Ct. 1022, 1027, 35 L.Ed.2d 359

(1973) (citations omitted). There is no implied immunization from the antitrust laws even where an agency is directed by statute to consider competitive factors before approving mergers if the agency is not required and did not hold a hearing, and there is no specific provision for judicial review. *United States v. Philadelphia National Bank*, 374 U.S. 321, 350–51, 83 S.Ct. 1715, 1734–35, 10 L.Ed.2d 915 (1963).[5]

There is no claim that a pervasive regulatory scheme is involved here. Like the parties in *United States v. Radio Corporation of America*, 358 U.S. 334, 350–51, 79 S.Ct. 457, 467, 3 L.Ed.2d 354 (1959), Cable Alabama and Comcast made a business judgment as to the desirability of the exchange and set the monetary terms of the exchange. The FCC has not prescribed rules and regulations limiting their ability to complete or not complete the exchange as their business judgement dictates.

Cable Alabama claims antitrust immunity can be implied in this action as it was in *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975) and *United States v. National Assn of Securities Dealers*, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) (*NASD*). In *Gordon*, the plaintiff claimed the system of fixed commission rates utilized by the securities exchanges violated the antitrust laws. The court noted that Section 19(b) of the Securities Exchange Act of 1934 gave the Securities and Exchange Commission (SEC) "direct regulatory power" over exchange rules and practices with respect to the fixing of reasonable rates of commission. The court said:

> [T]o deny antitrust immunity with respect to commission rates would be to subject the exchanges and their members to conflicting standards. It is clear from our discussion ... that the commission rate practices of the exchanges have been subjected to the scrutiny and approval of the SEC [equivalent to an affirmative order to the exchanges to follow fixed rates]. If antitrust courts

were to impose different standards or requirements, the exchanges might find themselves unable to proceed without violation of the mandate of the courts or of the SEC. Such different standards are likely to result because the sole aim of antitrust legislation is to protect competition, whereas the SEC must consider, in addition the economic health of the investors, the exchanges, and the securities industry.

*Id.* 422 U.S. at 689 and n. 13, 95 S.Ct. at 2614 and n. 13. Although the United States argued that antitrust immunity could be implied only where there was a pervasive regulatory scheme, the Court noted that the plaintiff had not argued that repeal should be implied because of a pervasive regulatory scheme but because of the specific provision of § 19(b)(9) and the regulatory action thereunder. The Court accepted the argument that the statutory provision authorizing regulation, the long regulatory practice, and continued congressional approval established that Congress had left the supervision of the fixing of reasonable rates of commission to the SEC, and that interposition of the antitrust laws which would bar fixed commission rates would preclude and prevent the operation of the Exchange Act as intended by Congress and effectuated by SEC regulation.

In *NASD*, the court found, *inter alia*, that antitrust immunity was implied by Section 22(f) of the Investment Company Act, which authorized mutual funds to impose restrictions on the negotiability and transferability of their shares provided the restrictions were disclosed in the registration statement and were not inconsistent with SEC rules and regulations. Although the SEC had not exercised its power to prescribe rules and regulations, the court found that the statute itself authorized the mutual funds to impose transferability or negotiability restrictions and the SEC had the role of administrative overseer. *NASD*, 422 U.S. at 727–728, 95 S.Ct. at 2447. The court found the antitrust laws, under which the restrictions would be per

---

**5.** Section 533(c) permits the FCC to prescribe rules with respect to ownership or control of cable systems by other media of mass communi-

cation, and one purpose of the Cable Act so as to "promote competition." 47 U.S.C. § 521(6).

se illegal, could not be reconciled with the SEC's authority under Section 22(f) to oversee the conduct of the mutual fund industry regarding the transfer restrictions. Therefore, the antitrust laws had to give way to allow the regulatory scheme under § 22(f) to work.

As noted by the Ninth Circuit in *Phonetele, Inc. v. American Telephone & Telegraph Co.*, 664 F.2d 716, 728 (9th Cir. 1981) (Kennedy, J.), at issue in both *Gordon* and *NASD* were statutes in which Congress explicitly contemplated conduct that would otherwise violate the antitrust laws. The statute at issue in *Gordon* explicitly gave the SEC power to fix and insure reasonable rates of commission, and the SEC's supervision was the legal equivalent of an affirmative order to the exchanges to follow fixed rates. *Gordon*, 422 U.S. at 666, 95 S.Ct. at 2603. The restrictions on transfer of the mutual fund shares at issue in *NASD* were explicitly authorized by the statute itself, subject only to oversight by the SEC. *NASD*, 422 U.S. at 720–721, 95 S.Ct. at 2443. Both practices constituted per se violations of the antitrust laws, *Gordon*, 422 U.S. at 689–90, 95 S.Ct. at 2615; *NASD*, 422 U.S. at 729, 95 S.Ct. at 2447, and in both cases there was evidence that Congress was aware of the activity at the time it passed the measures. *Gordon*, 422 U.S. at 664–67, 95 S.Ct. at 2602–04; *NASD*, 422 U.S. at 726–29, 95 S.Ct. at 2446–47.[6]

The statute and regulatory scheme at issue here do not meet the standards for antitrust immunity set out in *Gordon* and *NASD*. As in *Gordon*, the statute here confers power to regulate in a specific area upon an agency, but unlike the SEC in *Gordon*, the FCC has not here exercised a degree of scrutiny and approval equivalent to "an affirmative order" to follow a practice which violates the antitrust laws. Cable Alabama urges that the FCC could, in the future, create a regulatory scheme that is repugnant to the application of the anti-

trust laws. At present that is only a potential conflict, and not a concrete case or controversy. *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 376–77, 93 S.Ct. 1022, 1029, 35 L.Ed.2d 359 (1973). The FCC has not taken any regulatory action which creates a "plain repugnancy between the antitrust and regulatory provisions." *Philadelphia National Bank*, 374 U.S. at 350–51, 83 S.Ct. at 1734–35.

▮ Neither is this case similar to *NASD*. While the court in *NASD* did not require affirmative regulatory action to find an implied immunity from the antitrust laws, the statute at issue there explicitly contemplated restraints that would have constituted per se antitrust violations, subject only to SEC oversight. *NASD*, 422 U.S. at 726–729, 95 S.Ct. at 2446–47. Although the SEC had failed to regulate, the court found the SEC had sanctioned the anticompetitive conduct contemplated by the statute by electing not to initiate restrictive rules or regulations. *Id.* at 728, 95 S.Ct. at 2447. Unlike the *NASD* statute, the statute in this case does not explicitly permit anticompetitive conduct of any kind. 47 U.S.C. § 533(c). Section 533(c) merely provides that the FCC may regulate with respect to the ownership or control of cable systems by persons who own or control other media of mass communication. 47 U.S.C. § 533(c). The legislative history of Section 533(c) does not reveal any evidence that Congress intended the FCC's regulatory power under Section 533(c) to displace the antitrust laws. Although the House committee report contained a statement that the FCC had "exclusive jurisdiction" over cable services, persons who provided cable service, and the facilities related to such service pursuant to 47 U.S.C. § 152, the "exclusive jurisdiction" of the FCC did not, according to the same report, preclude application of the antitrust laws to limit the discretionary authority of franchising authorities. (Defendant's Appendix E, pp. 59, 95). Thus, neither the statute

---

6. In *NASD*, the Supreme Court also found antitrust immunity for an alleged horizontal conspiracy between NASD and its members to prevent the growth of a secondary dealer or brokerage market for mutual fund shares. The

court found the horizontal conduct was necessary to carry out the sanctioned vertical restraints. As Judge Kennedy noted in *Phonetele*, the activity acquired a kind of "derivative immunity." *Phonetele*, 664 F.2d at 729.

nor its legislative history provides evidence of a congressional intent to sanction anticompetitive mergers of cable systems and thereby insulate them from antitrust action. There is no explicit congressional approval of the anticompetitive effect of a merger between competing cable systems in a cable overbuild area.

Neither did Congress authorize the FCC or a private entity to order anticompetitive conduct. *Phonetele*, 664 F.2d at 733–34. "Antitrust immunity is not conferred by the bare fact that defendants' activities might be controlled by an agency having broad powers over their conduct. There is no general presumption that Congress intends the antitrust laws to be displaced whenever it gives an agency regulatory authority over an industry." *Phonetele*, 664 F.2d at 729. Nothing in 533(c) or its legislative history indicates that Congress intended to give the FCC exclusive power to regulate cable overbuild mergers. Although 533(c) generally grants regulatory authority to the FCC, it does not authorize cable companies to engage in anticompetitive activity in absence of FCC action as did the *NASD* statute. Therefore, Cable Alabama's argument that the FCC has authorized overbuild mergers through its decision not to regulate them must fail. As noted above, in *NASD* the anticompetitive activity at issue was authorized by statute and the SEC's failure to regulate to limit the anticompetitive activity did not amount to an "abdication" of its regulatory authority. In contrast, section 533(c) does not explicitly or implicitly authorize anticompetitive activity in absence of FCC regulation; rather, it is a general grant of regulatory authority to the FCC. In absence of statutory authorization or FCC regulatory authorization pursuant to a statutory grant of authority to regulate, there is no sanction of anticompetitive mergers of cable systems which could be repugnant to the antitrust laws.

■ Finally, for a regulatory mandate to confer implied antitrust immunity, there can be no inconsistency between the anticompetitive conduct and an express policy of the governing agency. *Phonetele*, 664

F.2d at 733. Although the FCC has never expressly prohibited anticompetitive mergers between cable companies in overbuild areas, it indicated in its 1990 report on cable competition that it preferred encouragement of cable competition. That policy is inconsistent with the conduct proposed here. In any event, there is a clear absence of congressional approval of the anticompetitive conduct at issue here.

There is no basis for finding the antitrust laws were displaced by section 533(c). There is no pervasive regulatory scheme; there is nothing that amounts to an affirmative order to by an authorized regulatory agency to undertake action violative of the antitrust laws as there was in *Gordon*; and there is no statute permitting the anticompetitive activity absent regulatory restraint as there was in *NASD*. There is, therefore, no repugnancy between conduct permitted or required by law and the antitrust laws. The court thus finds the overbuild merger at issue here is not immune from review under the antitrust laws and the FTC is properly exercising its regulatory authority in investigating the merger between Comcast and Cable Alabama. Cable Alabama's claim that the FTC has no jurisdiction to enforce the antitrust laws is, therefore, due to be dismissed.

### IV. The First Amendment Claim.

Cable Alabama claims that its right not to speak is being infringed by the FTC's investigation under the HSR Act.

■ A government regulation which limits First Amendment freedoms is sufficiently justified if it is within the constitutional power of the government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedom is no greater than is essential to the furtherance of that interest. *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

Cable Alabama claims the FTC has no substantial interest which justifies the infringement of its First Amendment rights

because the FTC has no jurisdiction to apply the HSR Act to the Cable Alabama's merger with Comcast. The court's finding that the FTC has jurisdiction to regulate cable system mergers in overbuild areas forecloses this claim. The government has a compelling interest in enforcing the antitrust laws. *FTC v. Superior Court Trial Lawyers Assn.*, 493 U.S. 411, 430–434, 110 S.Ct. 768, 779–781, 107 L.Ed.2d 851 (1990). The incidental restriction on Cable Alabama's First Amendment rights resulting from the HSR Act reporting procedure is no greater than is essential to the furtherance of the government's interest. Therefore, Cable Alabama's claim that the FTC's enforcement of the HSR Act reporting requirements unduly infringes its First Amendment rights is due to be dismissed.

## V. Conclusion.

The plaintiffs' motion for a preliminary injunction is due to be denied and the defendant's motion to dismiss should be granted. A separate order in conformity with this opinion will be entered.

### ORDER

In accord with the memorandum of opinion entered contemporaneously herewith, it is hereby ORDERED:

1. the plaintiffs' motion for a preliminary injunction is DENIED;

2. the defendant's motion to dismiss is GRANTED; and

3. costs are taxed against the plaintiffs.